## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**TERESA WILLIAMSON,**

     **Plaintiff**

**v.**                                 **No. 1:15-CV-958 JCH/LF**

**METROPOLITAN PROPERTY AND
CASUALTY INSURANCE COMPANY,**

     **Defendant.**

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on the following motions: (i) Plaintiff's Motion to Strike Dr. Slaughter Affidavits (Doc. 46-1 & 47-1) (ECF No. 56); (ii) Plaintiff's Third Motion for Partial Summary Judgment (Count II—Breach of Fiduciary Duty) (ECF No. 95); and (iii) Defendant's Motion to Dismiss for Willful and Bad Faith Discovery Violations and Authorities in Support (ECF No. 53). The Court, having considered the motion, briefs, evidence, arguments, and applicable law, will deny the motions.

## I.    FACTUAL BACKGROUND

### A.  Car Accident and Uninsured/Underinsured Policy

Ms. Williamson was involved in a car collision on April 27, 2012, in which she was rear-ended. *See* Independent Medical Evaluation ("IME") Report 2, ECF No. 9-1; Aff. of Horace Williamson ll. 9-11, ECF No. 9-1; Pl.'s Third Mot. for Summ. J., UF ¶ 1, ECF No. 95. The at-fault driver's insurance company was American National Property and Casualty Company ("ANPAC"). *See* Letter dated July 14, 2015, ECF No. 9-1 at 14 of 18; Def.'s Resp. to Pl.'s Third Mot. for Summ. J. 1, ECF No. 96. On May 1, 2012, Ms. Williamson had a recorded telephone conversation with Mara Bell, Claims Adjuster for ANPAC, in which she informed Ms. Bell she

was experiencing spasms in her right arm and shoulder, through her shoulder and her neck. *See* May 1, 2012 Tr., ECF No. 53-1 at 1-2 of 33. When asked if she had ever before had any previous injuries to the areas she mentioned, Ms. Williamson replied, "Not on my shoulder and neck. On my leg, on the right leg I had a knee surgery a year ago." *Id.* at 3 of 33.

At the time of the collision, Ms. Williamson was insured by Metropolitan Property and Casualty Company ("Metropolitan"), which provided uninsured/underinsured motorist coverage. Compl. ¶ 7, ECF No. 1-2; Answer ¶ 7, ECF No. 7. The policy with Metropolitan provided $10,000 in MedPay coverage and $250,000 in underinsured motorist coverage ("UIM"). Pl.'s First Mot. for Summ. J., Undisputed Fact ("UF") ¶ 3, ECF No. 9. The UIM component of the Policy, however, did not provide coverage for bodily injury "due to or resulting from an accident which occurred before the effective date of this coverage." Endorsement NM400B ¶ H, ECF No. 102-2 at 2 of 2.

Plaintiff's insurance policy with Metropolitan has a "Fraud and Misrepresentation" provision that states:

> All coverages under this policy are void if, whether before or after a **loss**, **you** or any person seeking coverage has:
>
> a. concealed or misrepresented any material fact or made any fraudulent statements; or
>
> b. in the case of any fraud or attempted fraud, affected any matter regarding this policy or any **loss** for which coverage is sought.

Policy ¶ 3, ECF No. 102-2 at 1 of 2 (bold in original).

On April 15, 2013, Mary Sadousky, a Claims Investigator with Metropolitan, interviewed Ms. Williamson. *See* April 15, 2013 Tr., ECF No. 53-1 at 4-6 of 33. Ms. Williamson reported she developed pain all in her back about five days after the accident. April 15, 2013 Tr., ECF No.

102-4 at 1-2 of 6. Ms. Sadousky asked Ms. Williamson if she had ever been injured at work, like slipping or falling, to which Ms. Williamson responded that she fell on her back 20 years ago, was treated by a doctor, but she got to a point where that pain had been gone. *See* April 15, 2013 Tr., ECF No. 53-1 at 5 of 33. Ms. Sadousky asked Ms. Williamson if in the last five years she had seen a chiropractor before, to which Ms. Williamson replied, "Never." *Id.* at 6 of 33. Ms. Sadousky then asked if Dr. Roche, her primary doctor who treated her for diabetes, had ever treated her because she was having problems with her back or neck. *See id.* Ms. Williamson responded, "Um, I, I was, but not even treated, but I was, uh, one, I had a sciatic pain sometimes…. And I don't know if he ever treat for that, uh, maybe not. I get the massage, a massage sometimes where it happen 'cuz…" *Id.* When asked if there was anything about the accident, her injury, and her condition that she would like Metropolitan to know, Ms. Williamson responded, "No, no, you have been very thorough." April 15, 2013 Tr., ECF No. 102-4 at 6 of 6.

### B.    Plaintiff's Underinsured Motorist Claim

Plaintiff made a claim with Metropolitan for medical payments coverage ("MedPay") after the accident. *See* Aff. of Horace Williamson ll. 9-13, ECF No. 9-1; Answer ¶ 12, ECF No. 7. On January 30, 2013, Metropolitan received signed medical authorizations from Ms. Williamson. Pl.'s Ex. B, ECF No. 106-2. As part of the claims process, Metropolitan required Plaintiff to undergo an Independent Medical Examination ("IME"). *See* Compl. ¶ 12, ECF No. 1-2; Answer ¶ 12, ECF No. 7.

Plaintiff contends that Metropolitan required she undergo the IME as a prerequisite to paying her MedPay benefits. *See* Aff. of Horace Williamson ll. 12-13, ECF No. 12-1. Defendant disputes this latter contention, arguing that the MedPay benefits were temporarily delayed to allow it time to obtain medical records and an IME to determine if the treatment was related to

the accident and reasonable and necessary. *See* Def.'s Resp. to Pl.'s Second Mot. for Summ. J. 4, ECF No. 26.

Metropolitan's MedPay adjuster selected and hired the Medical Examiner, an Orthopaedic Surgeon, Dr. Douglas Slaughter, to examine Ms. Williamson. Pl.'s First Mot. for Summ. J., Undisputed Fact ("UF") ¶¶ 5-6, ECF No. 9. The medical examination took place on October 18, 2013. *Id.* UF ¶ 7; IME Report, ECF No. 9-1 at 4 of 18. Ms. Williamson reported to Dr. Slaughter that the day after the car collision she began experiencing neck and low back pains and listed her medical care following the collision, including with Dr. Roche, Mr. Kern, and Dr. Cheng. *See* IME Report 2-3, ECF No. 9-1 at 5-6 of 18. She complained to Dr. Slaughter of "neck pain, neck spasm, and low back pain." *Id.* at 3. During the IME, Plaintiff informed Dr. Slaughter that prior to the April 2012 collision, she had no back and neck pain symptoms. *See* IME Report 1-5, ECF No. 9-1; Dep. of Teresa Williamson 103:5-17, ECF No. 53-1.

Dr. Slaughter reviewed x-rays she brought from the original images obtained by her physician Dr. Roche. *See* IME Report 2, 4, ECF No. 9-1. He also reviewed her medical records, the first of which was dated May 9, 2012. *See* IME Report 4-5, ECF No. 46-1. Dr. Slaughter noted that he reviewed medical records from Plaintiff's visit on April 30, 2013 with Dr. Emil Cheng at New Mexico Orthopaedics for neck, mid back, and low back pain. *See id.* at 5; Def.'s Resp., Ex. 1, ECF No. 18-1 at 1 of 7. Dr. Cheng stated in his report that Plaintiff "reports having a history of right sciatica," she was involved in a motor vehicle accident in April 2012, she noticed pain in May 2012, and she "is not sure if her symptoms are related to the motor vehicle accident." Def.'s Resp., Ex. 1, ECF No. 18-1 at 1 of 7.

After her examination, Dr. Slaughter reported, as relevant here, the following in response to Metropolitan's questions:

**2.     Based on the records provided, what is the typical, necessary treatment, frequency, and duration of care for an injury of this type?**

This is a soft tissue injury. In the past, it has been shown that cervical whiplash injuries can last up to two years with a minority lasting longer than that as far as symptoms are concerned. The claimant obviously by MRI does have some degeneration of the cervical and lumbar spine. This will be an ongoing issue as far as treatment and symptoms. In her physical therapy and chiropractic notes, she had what is typical for degenerative conditions which is waxing and waning of symptoms without any significant long term improvement.

> …

**3. Has the claimant's condition stabilized to a point where he/she has received maximum benefit from medical and/or chiropractic care?**

The claimant has undergone a significant amount of chiropractic care and has ceased this on her own. She has also undergone massage therapy, as well as physical therapy. She can definitely have her own exercise program and does not need further physical therapy. Chiropractic treatment also does not need to be explored further. *However, if the claimant has done relatively well from her single set of facet blocks, radiofrequency ablation may be beneficial to alleviate her pain for much longer periods of time*. She has not undergone any cervical injections to see if this helps to alleviate her symptoms. She *may* be a good candidate for cervical facet blocks and radiofrequency ablation on a periodic basis as well.

…

**4.     Does the claimant currently require further medical and/or chiropractic treatment or diagnostic studies for the condition resulting from the accident(s)? If so, please specify type, frequency, and duration.**

As stated above, the claimant has disc degeneration and facet arthropathy. The diagnosis related to the motor vehicle collision, including whiplash associated disorder at the cervical spine. In addition, the claimant does have or has an exacerbation of her degeneration in the lumbar spine. *It is felt that this claimant could undergo further lumbar facet blocks and potential radiofrequency ablation to assist in the pain relief from her degeneration which reportedly she was asymptomatic from prior to the motor vehicle collision*. This could also be a reasonable treatment in the cervical spine. However, Dr. Cheng has not been able to ascertain whether epidural injections or facet blacks are going to be most beneficial for her cervical pain. As far as the cervical pain is concerned, I would suggest that she have the appropriate injection approximately two to three times per year *as needed for pain relief*…. The injections in the lumbar spine would also be approximately two to three times per year *based on symptom reduction*.

**5.     Re: Causation, within a reasonable degree of medical certainty, when could have (or can) the condition that relates to the accident in question be considered resolved, requiring no further care? Does the medical**

> documentation support a causal relationship between the accident in question and the injuries sustained?
>
> Regarding causation, the claimant definitely had a pre-existing degenerative condition in both the cervical and lumbar spine. It is felt by this examiner that *she has had an exacerbation or a permanent aggravation of her cervical degeneration and lumbar degeneration*. No further injury has obviously been sustained in the motor vehicle collision. The injuries, unfortunately, can be *persistent*.
>
> …
>
> ### DIAGNOSES RELATED TO THE MOTOR VEHICLE COLLISION
>
> 1. Cervical spondylosis without myelopathy or facet joint degeneration, exacerbation/aggravation.
> 2. Cervical disc degeneration/aggravation/exacerbation.
> 3. Lumbar disc degeneration, aggravation/exacerbation.
> 4. Lumbar facet arthropathy/lumbar spondylosis without myelopathy, aggravation/exacerbation.

IME Report 7-9, ECF No. 9-1 (italics emphasis added).

At some point during the insurance claims process, Plaintiff sent Metropolitan a copy of Dr. Cheng's April 30, 2013 medical record. Aff. of Teresa Williamson, ECF No. 60-4. Metropolitan subsequently paid Plaintiff $10,000 for medical payments pursuant to the MedPay benefits in the Policy. *See* Aff. of Horace Williamson ll. 17-19, ECF No. 9-1 at 1 of 18; Def.'s Resp. ¶ 14, ECF No. 18. On March 13, 2015, Plaintiff settled for $43,000 her third-party claim against the at-fault driver, who had an insurance policy with a limit of $50,000. *See* Pl.'s First Mot. for Summ. J., UF ¶ 15, ECF No. 9.

On July 14, 2015, Thomas Mescall, counsel for Plaintiff, sent Metropolitan a letter notifying it of the settlement of her third-party claim and offering to settle her first party underinsured claim for $207,000. Letter dated July 14, 2015, ECF No. 9-1 at 14 of 18. In the letter, counsel stated that the $43,000 settlement barely covered Ms. Williamson's past medical expenses, and thus, failed to compensate her for past pain and suffering, future pain and suffering

and future medical payments. *Id.* Counsel attached the IME Report and included copies of past medical bills, asserting that the total amount for past medical treatment was $37,125. *See id.* at 14-16 of 18. Mr. Mescall attached medical records and bills for post-accident treatment from Dr. Roche, Terry Kern Physical Therapy, Michelle Emberger, Soothing Hands Massage, and NM Orthopaedics. *Id.* at 16 of 18. The records included a print-out of medical treatment from New Mexico Orthopaedics, beginning in July 1, 2011, which listed treatments for "Lumbago" and treatment by Dr. Christopher Patton. Pl.'s Ex. G, ECF No. 106-7. In his letter, Mr. Mescall based his past medical treatment cost on treatment beginning on May 9, 2012, with the last listed date of treatment as December 29, 2014. Letter dated July 14, 2015, ECF No. 9-1 at 16 of 18.

In explaining the reasons behind the settlement offer, Mr. Mescall asserted that Dr. Slaughter recommended future medical treatment of cervical facet blocks and lumbar facet blocks; Plaintiff has had a cervical facet block at a cost of $3,893 and lumbar facet blocks ranging in cost from $4,132 to $9,967; and calculating two to three of each block per year for her life expectancy of over 30 years, her future medical costs would exceed the UIM policy limits (giving, for example, the amount for three cervical facet blocks per year for 30 years as $342,000 and $371,880 for three lumbar facet blocks per year for 30 years, at the low end of the cost range). *See id.* at 15-16 of 18.[1] Mr. Mescall concluded that Ms. Williamson was entitled to 100% of her damages because "the uncontradicted medical records and the uncontradicted testimony establish[] that Ms. Williamson was asymptomatic at the time of the 2012 car collision." *Id.* at 17 of 18.

Jacob Martinez is a Senior Claims Adjuster employed by Metropolitan and assigned to Plaintiff's claim. Aff. of Jacob Martinez ¶¶ 2-4, ECF No. 18-1 at 5 of 7. Mr. Martinez reviewed

---

[1] Defendant disputes the basis for counsel's calculations and assertions made in his letter.

Plaintiff's settlement demand letter, including the medical bills from May 9, 2012 through December 29, 2014. *See id.* ¶¶ 6-8. Metropolitan did not receive any additional medical records or bills about treatments from Plaintiff or her counsel during 2015. *See id.* Metropolitan asserts it evaluated Plaintiff's claim to be approximately $50,000 to $56,000, relying on the assumption that Plaintiff had ended medical treatment in December 2014 and, therefore, he did not consider any future medical costs in the evaluation. *See id.* ¶¶ 8-9; Pl.'s Third Mot. for Summ. J. 2, ECF No. 95 ("[I]t is undisputed that Metropolitan had determined that Ms. Williamson's personal injury claim was worth between $50,000 to $55,000.").

By letter dated August 21, 2015, Mr. Martinez informed counsel for Plaintiff the following: "As discussed in our conversation of 08/21/2015, we offer a settlement of $1000 for your client's bodily injury claim." Letter dated Aug. 21, 2015, ECF No. 96-1 at 3 of 6. Mr. Martinez gave no written explanation in the letter for the settlement offer amount. *See id.* Metropolitan's offer occurred in the regular course of its insurance business. Pl.'s Second Mot. for Summ. J., UF ¶ 31, ECF No. 12. Metropolitan contends that it was a reasonable settlement, because it paid $10,000 in MedPay to Plaintiff, and she received $43,000 from the other driver. *See* Aff. of Jacob Martinez ¶¶ 10-12, ECF No. 18-1 at 6 of 7. Plaintiff disputes the reasonableness of the offer.

### D.  Subrogation of MedPay[2]

---

[2] Many of the facts concerning this subrogation issue Plaintiff raised for the first time in its reply in support of her First Motion for Partial Summary Judgment. Defendant filed a Sur-reply, arguing that the Court should strike the facts raised for the first time in the reply. Def.'s Sur-reply 2-3, ECF No. 46. Following the completion of briefing on the first partial motion for summary judgment, Plaintiff filed her Third Motion for Partial Summary Judgment, setting forth the same facts on subrogation and Defendant filed a response disputing the facts. *See* Pl.'s Third Mot. 7-8, ECF No. 95; Def.'s Third Resp. 3-5, ECF No. 96. Because Defendant had subsequent opportunity to address the facts, the Court will not strike the facts set forth in Plaintiff's reply and will consider the full record in considering the multiple motions before it.

The UIM Policy contains a provision that reduces the amount paid to the insured by any amount paid under the Medical Expense sections of the Policy. *See* Endorsement NM400B, ECF No. 96-1 at 6 of 6. On October 16, 2014, Shannon Kelly, a Subrogation Adjuster for Metropolitan, wrote counsel for Plaintiff the following: "You were previously put on notice of our subrogation rights for the 1st party benefits paid on behalf of your client. Please provide a status of our subrogation claim." Letter dated Oct. 16, 2014, ECF No. 100-1. On September 21, 2015, counsel for Plaintiff wrote Ms. Gauthier a letter asserting the reasons under New Mexico law why Metropolitan was not entitled to subrogation because Plaintiff had not been fully compensated when she settled her third-party claim against the at-fault driver. *See* Pl.'s Ex. C, ECF No. 34-2. According to a note in the claim file, on September 23, 2015, Margaret Gauthier, a Supervisor for Metropolitan, wrote "it looks like you have taken the offset of the 10K in amp subro in AUU evaluation along with the tort limits – please confirm you have used this in their eval and are waiving our subro – thanks!" Pl.'s Ex. B, ECF No. 34-3; Pl.'s Ex. D, ECF No. 34-3. The next note in the claim file is dated September 24, 2015 from Mr. Martinez to Ms. Gauthier, stating, "I discussed this matter with Management and we are not waiving subro. And please keep me updated if there is a payment or rejection from American National." Pl.'s Ex. B, ECF No. 34-1. By letter dated October 6, 2015 from Ms. Gauthier, Metropolitan informed Plaintiff that it was agreeing to waive its MedPay subrogation. Pl.'s Ex. D, ECF No. 34-3.

Plaintiff argues that Metropolitan unlawfully demanded subrogation for her MedPay benefits, and that the $1,000 settlement offer was conditioned on having to repay Metropolitan's subrogation claim for $10,000. Pl.'s Third Mot. ¶ 3, ECF No. 95 at 7 of 9. Defendant disputes this fact, arguing instead that the internal claim file note referred to waiving subrogation against ANPAC, the other driver's insurer, based on the $7,000 remaining under ANPAC's policy. *See*

Def.'s Resp. 3-4, ECF No. 96.[3] Mr. Martinez avers that it "was never my intention to not waive subrogation with respect to the insured" and he never discussed subrogation issues with Mr. Mescall. Aff. of Jacob Martinez ¶¶ 7, 9, ECF No. 96-1.

### E.  Complaint and Interrogatories

On September 22, 2015, Plaintiff filed suit against Metropolitan for breach of its insurance duties. Compl., ECF No. 1-2. In Count I, Plaintiff alleges Defendant breached its contractual duty to provide underinsured coverage by offering only $1,000 for her past pain and suffering, future pain and suffering, and future medical payments. Plaintiff asserts in Count II and III that Defendant breached its fiduciary duty and breached the covenant of good faith and fair dealing, respectively, by requiring her to undergo an IME, then refusing to accept the medical examiner's findings that she would require future medical treatment that would exceed policy limits, yet offered only $1,000, thereby subjecting her to a needless intrusive medical examination. In Count IV, Plaintiff brought a cause of action for violation of New Mexico's Unfair Insurance Practices Act by unreasonably subjecting Plaintiff to an intrusive and irrelevant IME as an abusive tool to delay processing her claim and by offering her a frivolous and unfounded offer of only $1,000. Finally, Plaintiff alleges in Count V a violation of the Unfair Practices Act by falsely implying that $1,000 was sufficient to compensate her, thereby failing to deliver the quantity of services for which she contracted.

On November 20, 2015, Metropolitan sent Plaintiff its first set of interrogatories and first requests for production. Certificate of Service, ECF No. 10. On January 6, 2016, Metropolitan

---

[3] To support its argument that the reference to not waiving subrogation of MedPay was regarding the other insurer, not Plaintiff, Defendant cites statements from the Affidavit of Jacob Martinez, ECF No. 96-1. Plaintiff contends that Mr. Martinez was a claims adjustor in Dallas who does not have personal knowledge about the actions taken by Metropolitan's subrogation department in North Carolina. *See* Pl.'s Reply 2-3, ECF No. 100.

received Plaintiff's Answers to Defendant's First Set of Interrogatories. Def.'s Ex. 5, ECF No. 53-1 at 19-23 of 33. Interrogatory No. 9 asked for the complete details of her physical and mental medical history prior to the accident, including the names and addresses of all medical providers and the purpose of each treatment. *Id.* at 20-21 of 33. For the time period prior to the accident and as relevant here, Plaintiff listed, among others, Dr. Clare Castiglia as a primary care physician; Dr. Richard Roche as a primary care physician for general medical needs; Terry Kern for physical therapy after knee surgery; Dr. Frank Heckl for her knee surgery; Dr. Valerie Talento for pain treatment; Dr. Alan Rogers from 2004-2006 for "general medical needs and also referred to the pain clinic for sciatic nerve pain where I received injections on 2 occasions." *Id.* at 21-22 of 33. In response to Interrogatory No. 14 for a list of all injuries, complaints, and symptoms that she claims to have sustained as a result of the accident, Plaintiff responded, "I have been experiencing severe pains in my lumbar and cervical regions…. I have difficulty sitting or walking for the extended periods that I used to be able to prior to the accident…" *Id.* at 23 of 33. Interrogatory No. 15 inquired if any of the injuries complained of constitute an aggravation of a pre-existing condition, describe the pre-existing condition that was aggravated and list medical providers who gave treatment for the pre-existing condition. *Id.* Plaintiff responded, "I am not aware of any pre-existing conditions as I had not had treatments prior to the accident for pain in my cervical or lumbar regions." *Id.* She listed no treatment providers. *Id.*[4]

On January 7, 2016, Mr. Mescall hand-delivered her responses to Metropolitan's requests for production. *See* Def.'s Ex. 8, ECF No. 75-1 at 2 of 9.

### F.  Past Medical Records

---

[4] Plaintiff made similar responses in the underlying state case when answering ANPAC's interrogatories. *See* Def.'s Ex. 3, ECF No. 53-1 at 7-12 of 33.

Metropolitan discovered the following information within the medical records. On July 6, 2004, Plaintiff saw Dr. Alan Rogers for chest pains and a history of diabetes, and among other things, he noted "Sciatica … Old problem. Uses Ibuprofen OTC." Def.'s Ex. B, ECF No. 47-1 at 14-15 of 62. On October 31, 2005, she came to Dr. Rogers for a follow up visit for sciatica, which she described as "[w]orse for 2 months" and "severe" and that it hurt to move her right leg. *Id.* at 20 of 62. She reported having back problems off and on for five years, which she said resolves on its own. *Id.* Dr. Rogers ordered an MRI of her lumbar spine because of her sciatica. *See id.* at 23 of 62. The MRI showed "6 lumbar type vertebral bodies," a "small central disk protrusion impressing upon the thecal sac at L4-5 without neural impingement," and "mild facet arthritis at bilaterally at L5-L6 and L6-S1." *Id.* On a January 31, 2006 visit, Dr. Rogers noted Plaintiff had an "extra lumbar vertebra and also facet arthritis" [sic], pain in her low back and into her right buttock, and he referred her to Dr. Paul Fullerton at the Pain Clinic for her sciatica and low back pain. *See id.* at 26-28 of 62.

On March 7, 2006, Dr. Fullerton gave Plaintiff a transforaminal L5-6 right epidural steroid injection. *Id.* at 29 of 62. Dr. Fullerton diagnosed internal disc disruption, degenerative disc disease, and facet arthropathy, and he discussed a treatment plan with her and her husband. *Id.* at 29-30 of 62. Dr. Fullerton gave Plaintiff another transforaminal epidural steroid injection at L5-6 on April 27, 2006, because of ongoing pain, "primarily lower back," and radiating down into her right leg, which he believed arose from the small disc protrusion at L4-5 and unlikely associated with her facet arthritis. *See id.* at 32 of 62.

On May 29, 2007, Plaintiff saw Dr. Clare Castiglia, reporting among other symptoms that her shoulders had been aching for one or two weeks, achiness Plaintiff believed was caused by one of the drugs she was taking. *See id.* at 36-37 of 62. On July 27, 2007, Plaintiff reported to Dr.

Castiglia, among other symptoms, that she still had shoulder pain, but described it as very intermittent. *Id.* at 38-39 of 62. Plaintiff had a follow-up appointment with Dr. Castiglia on October 23, 2007, and stated that she had, among multiple other symptoms, "some back pain" and pointed to her lower thoracic in the flank area, which she said hurts more when she sits too long or wrong, and she reported "chronic hip pain in the past." *Id.* at 40 of 62. Dr. Castiglia noted that Plaintiff had definite pain when she side bent to the left and told her she believed the back pain "is mechanical, more muscular." *Id.*

On February 14 and May 16, 2008, Plaintiff presented to massage therapist Linda S. Duty, LMT, MMP, at Soothing Hands Massage with right hip and left arm pain, and received treatment focused on the left scapular, gluteal and right quadratus lumborum regions. *See* Def.'s Ex. 9, ECF No. 75-1 at 3 of 9.[5]

On March 19, 2009, Plaintiff had a follow-up with Dr. Roche, reporting numerous symptoms including intermittent chest discomfort and "some pain in her shoulders." Def.'s Ex. B, ECF No. 47-1 at 42 of 62.

In 2011, she went to New Mexico Orthopaedics for knee pain, had knee surgery, and underwent physical therapy sessions with Terry Kern. *See id.* at 44, 50, 53 of 62. Her physical therapist reported that Plaintiff's "persistent pelvic and hip instability caused by the iliacus could also explain her history of sciatic symptoms." *Id.* at 50 of 62. On a July 27, 2011 visit, Mr. Kern noted "isolated upper cervical instability." Def.'s Ex. 7, ECF No. 75-1 at 1 of 9. Mr. Kern referred her to Dr. Christopher Patton, believing that if she improved the stability of her pelvic

---

[5] Defendant presents other records from Ms. Duty showing additional massages. The Court agrees, however, with Plaintiff's argument that it is not clear when the therapy notes list "back – neck – hips" that Plaintiff was reporting pain in those areas.

and hip, she could make full recovery with her knee. Def.'s Ex. B, ECF No. 47-1 at 53 of 62. He noted she has a history of what she calls sciatica pain on the right. *Id.*

On August 8, 2011, Plaintiff went to Dr. C. A. Riekeman, a chiropractor, for hip pain, noting it was difficult to walk after her knee surgery. Pl.'s Ex. A, ECF No. 60-1 at 1 of 6. Under "Muscles & Joint Symptoms," Plaintiff checked "backache," "painful tail bone," and "pain between shoulders." *Id.* at 2 of 6.

On August 18, 2011, Plaintiff saw Dr. Patton at New Mexico Spine for her "hip problem" after knee surgery. Def.'s Ex. B, ECF No. 47-1 at 54 of 62. In a body diagram, she charted pain in the hip and knee areas. *See id.* She rated back pain as a 6 out of 10 in severity. *See id.* Under previous treatments, she listed physical therapy, massage, and "once" for chiropractor. *Id.* at 55 of 62. Under "Previous Treatments for Pain," Dr. Patton noted that Plaintiff had been followed at the Santa Fe Pain Clinic for low back symptoms and had shots. *Id.* at 56 of 62. She stated during the visit that she was having more pain in the right buttock and right lateral hip that was "constant and worsening." *Id.* He had an x-ray evaluation performed, noting "lumbarization of the S1 vertebral body with six lumbar type vertebrae." *Id.* Dr. Patton believed that the knee surgery most likely contributed to her walking difficulty that contributed to the development of greater trochanteric bursitis. *Id.* at 57 of 62.

On September 28, 2011, Dr. Valerie Talento at the Talento Acupuncture Clinic saw Plaintiff for help with her "sciatic nerve/R. Leg – Lower back pain" and right knee problem. Def.'s Ex. 4, ECF No. 53-1 at 14 of 33. Plaintiff stated that the problem started ten years ago and that she had tried treatments of massage and injection for pain. *Id.* On a subsequent visit on September 29, 2011, chronic sciatica was noted. *Id.* at 18 of 33.

On November 29, 2011, Plaintiff in a medical appointment reported having "LB pain indicating the spine" but was "using aspercream which helps." Def.'s Ex. B, ECF No. 47-1 at 62 of 62.

### G.  Post-Accident Treatment

On January 23, 2013, Dr. Roche examined Ms. Williamson, diagnosed her with neck pain with osteoarthritis, and referred her to N.M. Spine and Dr. Cheng. Def.'s Ex. E, ECF No. 102-5.

Ms. Williamson received an injection on December 26, 2014. Aff. of Horace Williamson ll. 4-7, ECF No. 34-4. She received a lumbar facet block injection on September 2, 2015, and a cervical facet block injection on December 14, 2015. *Id.* Plaintiff continues to receive cervical and lumbar facet blocks. Aff. of Horace Williamson l. 11, ECF No. 12-1 at 2 of 3.[6]

On November 17, 2015, Dr. Robin Hermes from New Mexico Orthopaedics saw Ms. Williamson for mid back pain after a motor vehicle accident, noting that there was a history of prior injury to this mid back. Def.'s Ex. H, 102-8 at 1 of 5. Dr. Hermes examined Plaintiff again on January 5, 2016. *Id.* at 5 of 5. In her chart, Dr. Hermes noted that Plaintiff "would like it specified that she has had no prior injury to her back or neck prior to the car accident that occurred in 2012. There was a statement in her initial visit that stated 'there was prior injury to her back' but this actually referred to her car accident." *Id.*

### H.  Plaintiff's Deposition Testimony

---

[6] Defendant disputes this fact by stating it has not received records of such treatment, it has not had an opportunity to cross examine either Plaintiff or her husband, and because Plaintiff did not make it aware she was receiving additional treatments when they were negotiating the settlement of the UIM claim, any such treatments are not material to the dispute. *See* Def.'s Resp. to Pl.'s Second Mot. for Summ. J. ¶ 25, ECF No. 26 at 7 of 17. Although Defendant has not deposed Mr. or Mrs. Williamson, it did not request an opportunity to depose them under Rule 56(d) prior to the Court ruling on the motions. Because Mr. Williamson's affidavit is evidence the Court may consider at this stage in the proceedings, the Court will consider it. However, the Court will consider the evidence in light of all inferences construed in favor of the non-moving party and will address relevancy arguments when considering the motion to which the alleged fact pertains.

At her deposition, Ms. Williamson acknowledged understanding that she had a duty to be honest with her insurance company and that withholding relevant information her insurance company needs to evaluate a claim may constitute fraud. *See* Dep. of Teresa Williamson 11:24-12:12, 16:6-10, ECF No. 53-1. Plaintiff testified to understanding what fraud means, stating fraud is "being nontruthful." *Id.* 12:16-22. Plaintiff stated she relied on her lawyers to send Defendant all her medical records. *See id.* 51:22-52:24. She understood that the purpose of the IME was for the insurance company to fully understand her medical condition, so they could decide whether to pay the medical payments under the policy. *Id.* 101:20-102:13.

When defense counsel asked if she thought Metropolitan was entitled to look at her medical records showing the 10-year history of low back pain, she responded, "They could ask for them." *Id.* 58:10-14. Ms. Williamson explained, however, that she was asymptomatic prior to the accident and that she did not commit fraud because she had sciatic pain "which is different than the back pains that I have now." *See id.* 57:17-58-9.

Later, Ms. Williamson admitted that she had seen a chiropractor in 2011. *Id.* 85:2-4.[7] Defense counsel asked Ms. Williamson about the answers she gave to ANPAC on May 1, 2012, and why she did not mention complaints to her doctors about shoulder pain in 2007 and 2009 or her history of sciatica. *See id.* 90:15-96:25. Plaintiff responded, "Don't ask, don't tell." *Id.* 93:25-94:2. She additionally indicated that Ms. Bell asked about "previous injuries" and she did not have an injury; her shoulder and neck issues were not injuries for which she had any treatments. *See id.* 93:19-95:11. Plaintiff explained that her doctor believed that some of the medications she was taking were causing the muscle pains, and indicated that the neck pain she had now is not of

---

[7] Plaintiff asserts that she explained in her deposition that she forgot about the chiropractor visit, and promptly submitted the record to Metropolitan when she remembered. Pl.'s Resp. to Def.'s Mot. for Summ. J. ¶ J, ECF No. 106. The Court could not find in the record the portion of her deposition supporting this proffer.

the same type. *See id.* 95:3-96:14. She denied having prior injuries to her neck, referring to her prior symptoms as "stress pains." *Id.*

Defense counsel also told Plaintiff that she did not tell Ms. Sadousky about her history of back pain and sciatic pain, injections, and things of that nature, and asked, "You don't say anything about any of that in your statement to Ms. Sadousky here, do you?" *Id.* 85:21-86:1. Plaintiff replied, "No. She asked have you been treated with him because you were having problems with your back or neck. My back and my neck were not hurting. Was my sciatic pain that was hurting. It was my sciatica." *Id.* 86:2-6.

During her deposition, Plaintiff testified she intentionally lied to Dr. Cheng on April 30, 2013 by falsely claiming she was not sure if her spinal symptoms were related to the accident because he did not see patients with car accidents; she waited two treatments to reveal that she had initially lied to him to alleviate his concerns he might have to testify as a witness. *See* Def.'s Mot. for Summ. J., Undisputed Fact ("UF") ¶¶ 31-33, ECF No. 102. On March 6, 2015, Dr. Cheng charted that Plaintiff recalls her pain starting two days after the April 2012 motor vehicle accident. Def.'s Ex. F, ECF No. 102-6. Plaintiff stated she lied because New Mexico Orthopaedics will not see patients whose symptoms relate to car accidents, but she knew that Dr. Cheng was a very good doctor. Dep. of Teresa Williamson 107:12-109:8, ECF No. 106-5.

## I.   Affidavit of Dr. Slaughter

On January 19, 2016, Dr. Slaughter signed an affidavit stating that in preparing his prior IME, he did not intend to imply that Mrs. Williamson "required" three injections in either her cervical spine or lumbar spine per year. Aff. of Dr. Slaughter ¶ 12, ECF No. 47-1. He explained

that his IME was based on information Mrs. Williamson provided him at the time, and that she reported she had no symptoms in her back or neck prior to the car accident. *Id.* ¶¶ 4-5.

He further attested that, subsequent to his IME of Plaintiff, he was given and reviewed prior medical records for Plaintiff suggesting that she did in fact have a long history of prior back and neck symptoms, dating at least to 2004, records that were not made known to him prior to the IME. *Id.* ¶¶ 6, 11. He noted the records indicate she has had mechanical symptoms in her low back with radiating pain in the right lower extremity intermittently and a history of neck pain. *Id.* ¶ 7. He stated: "These records also reveal Mrs. Williamson has been treated with spinal injections in 2006 and 2011." *Id.* Based upon his review of the additional information, he now believes she does not warrant any further treatment as a result of the April 2012 vehicle accident. *Id.* ¶ 13.

Plaintiff asked her expert, Dr. Brian M. Shelley, to review Dr. Slaughter's IME, his subsequent Affidavit, and the medical records upon which Dr. Slaughter relied. *See* Medical Record Review Report 3, ECF No. 56-1. Dr. Shelley concluded that Plaintiff's medical records from July 6, 2004 through November 29, 2011 do not indicate that she received any spinal injections in 2011. *Id.* at 3, 6. He also opined that, contrary to Dr. Slaughter's contention in his Affidavit in paragraphs 6 and 7, the records of prior care do not indicate that she had any neck pain or chronic neck pain prior to the motor vehicle crash. *Id.* at 3, 6. Dr. Shelley notes, however, that she "reported back pain as far back as 2004" and mentioned back pain only once in her medical records from 2011, on November 29, 2011. *See id.* at 3-4. Dr. Shelley agrees that Ms. Williamson had intermittent back pain for years, but notes that because Dr. Slaughter had Dr. Cheng's report of a history of sciatica, he had the information about back pain at the time of the evaluation. *Id.* at 4. Dr. Shelley also stated that there were no medical reports of back pain

between November 11, 2011 and the date of her accident, April 27, 2012. *Id.* Finally, Dr. Shelley stated that Dr. Slaughter in his IME Report documented a physical exam that was negative for sciatica, indicating that he did not find any objective signs of sciatica on that date. *Id.* at 6.

In his report, Dr. Shelley opined that there was no evidence that Ms. Williamson had continuous severe back pain and/or sciatica right before her motor vehicle accident; the records indicate her baseline pattern was intermittent with the pain generally responsive to treatment or was self-limiting. *Id.* at 5. That pattern, Dr. Shelley stated, contrasts with the more severe and continuous back pain and right lower extremity symptoms after the motor vehicle accident for which more intensive treatment and pain management techniques were recommended. *Id.*

During his deposition, Dr. Shelley testified that Plaintiff hired him primarily to rebut Dr. Slaughter's affidavit. Dep. of Dr. Shelley 22:7-10, ECF No. 102-1. He stated he requested copies of all medical records relating to Ms. Williamson, and counsel for Plaintiff provided him a portion of her medical records – the records Dr. Slaughter had reviewed to reach his opinions in his affidavit. *See id.* 18:20-19:2, 19:14-18, 20:18-23, 46:13-16; and 123:21-24, ECF No. 106-4. Dr. Shelley had not reviewed prior to his deposition records from Talento Acupuncture Clinic, which he agreed indicated that Plaintiff was complaining of neck pain to her acupuncturist on October 18, 2011. *Id.* 46:12-47:7, ECF No. 102-1. Dr. Shelley acknowledged he did not review any of the records from Soothing Hands Massage. *See id.* 48:4-49:2. He noted that defense counsel had shown him other records that showed more incidents of neck pain. *Id.* 58:14-20.

Defense counsel asked Dr. Shelley, after reviewing Plaintiff's answer to Interrogatory No. 15 and in light of the medical records he reviewed, "that is a false answer; is that correct?" *Id.* 59:8-60:4. Dr. Shelley answered, "Correct. On 4/27/06, she had epidural steroid injection to the lumbar spine." *Id.* 60:5-6. He noted it was either a lie or a bad memory. *Id.* 60:7-12. Dr.

Shelley additionally testified that his statement that Plaintiff had back pain as far back as 2004 was based on the medical record from July 6, 2004 from Dr. Rogers of "SCIATICA. Old problem." Dep. of Dr. Shelley 60:23-61:10, ECF No. 102-1. Dr. Shelley acknowledged, however, that sciatica is a general term referring to some sort of pain or symptom in the leg, thought to be coming out of the low back, but that sometimes you can have mostly leg symptoms and very little in the way of back symptoms. *Id.* 96:2-13, ECF No. 106-1. He also testified that a patient can have lower back pain without having sciatic pain and that lower back pain is different from sciatica. *Id.* 96:14-20. Dr. Shelley later clarified that sciatica and lower back problems are related if it is truly sciatica because people can have sciatica from nerve root problems that come out of the spine. *See id.* 110:5-111:8, ECF No. 109-1. Patients with sciatica do not always have low back pain, but generally patients with sciatica do have low back pain as well as leg symptoms. *See id.*

## II.     ANALYSIS

### A.  Plaintiff's Motion to Strike Dr. Slaughter Affidavits (ECF No. 56)

Plaintiff asserts that Metropolitan submitted an error-plagued affidavit as a result of carelessness or perjury, and that the Court should strike the affidavits under Federal Rule of Civil Procedure 56(h). Plaintiff argues that Dr. Slaughter's affidavit states that Plaintiff received spinal injections in 2011, a fact that is not contained within the medical records. Plaintiff asserts that Dr. Shelley also refutes the statement by Dr. Slaughter that the medical records indicated a history of neck pain. Finally, Plaintiff asserts that Dr. Slaughter knew that Plaintiff had a history of sciatica, so his statement that he was without knowledge of her history of chronic back issues was untrue. Plaintiff contends that the affidavit deliberately misleads the Court into suspecting

that Plaintiff lied about her car accident causing sciatica and lied about her sciatica never existing before the car accident.

Defendant contends that striking the affidavits is not the appropriate sanction under Rule 56(h) and that Dr. Slaughter's Affidavit is foundationally and legally sound. It argues that any contradictions between Dr. Slaughter's IME Report and Affidavit are proper subjects of impeachment during cross-examination and go to the weight, not the admissibility of, his testimony.

Federal Rule of Civil Procedure 56(h) provides that if a court finds that a party submitted an affidavit under Rule 56 in bad faith or solely for delay, the court, after notice and a reasonable time to respond, may order the submitting party to pay the other party the reasonable expenses, including attorney's fees, incurred as a result, or may hold the offending party or attorney in contempt or subject them "to other appropriate sanctions." Fed. R. Civ. P. 56(h). Among the appropriate sanctions courts may consider are striking affidavits submitted in bad faith. *See*, *e.g.*, *Caron v. QuickKutz, Inc.*, No. CV-09-02600-PHX-NVW, 2012 WL 5497869, at *20 (D. Ariz. Nov. 13, 2012); *nVision Global Technology Solutions, Inc. v. Cardinal Health 5, LLC*, 887 F.Supp.2d 1240, 1260 (N.D. Ga. 2012).

After reviewing the record, the Court is not convinced that Defendant submitted Dr. Slaughter's affidavit in bad faith or solely for purposes of delay. Although Plaintiff has highlighted grounds that potentially undermine the credibility of Dr. Slaughter's later-formed conclusions, the potential errors in Dr. Slaughter's affidavit do not show bad faith or an attempt to delay the proceedings. The Court will deny Plaintiff's motion to strike the affidavits. Nevertheless, the Court, when considering the factual assertions made in Dr. Slaughter's

Affidavit when examining other pending motions, will consider the facts set forth in Dr. Shelley's report when determining if disputes of fact exist.

### B.  Plaintiff's Third Motion for Summary Judgment (ECF No. 95)

On a motion for summary judgment, the moving party initially bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab*., 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (internal quotations omitted). Under Rule 56(c), only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See id.* at 248.

Plaintiff's third motion for summary judgment is based on its argument that Defendant breached its fiduciary duty to her by unlawfully demanding she refund the $10,000 in MedPay benefits, resulting in her recovering less than the $50,000-$55,000 that Metropolitan admits her claim is worth. Defendant argues that the record supports its position that it never demanded subrogation of MedPay from Plaintiff and its settlement offer contained no such conditions. Additionally, Defendant asserts that Plaintiff has never pled this allegation in her Complaint, or moved to amend the Complaint to include it. Defendant contends that, when an insured has been

fully compensated, state law upholds the enforceability of a provision in a UIM policy that permits an insurer to offset the amounts paid or payable under the medical payments coverage in the policy. *See Fickbohm v. St. Paul Ins. Co.*, 2003-NMCA-040, ¶ 23, 133 N.M. 414 (holding that offset for medpay in UM/UIM policy is enforceable where insureds are fully compensated for their damages). Defendant asserts that, because there is a factual dispute regarding the damages Plaintiff sustained and whether she was fully compensated, Plaintiff cannot establish as a matter of law that no offset is permitted.

Defendant has presented sufficient evidence to create an issue of material fact as to whether Defendant even made a subrogation demand from Plaintiff, the theory underlying her third motion for summary judgment. Construing the record in Defendant's favor, a reasonable jury could find that Metropolitan's reference to subrogation concerned its subrogation claim against ANPAC, not a demand for payment from Plaintiff. Plaintiff has not met her burden of showing that no genuine issue of material fact exists and is therefore not entitled to summary judgment on this theory of breach of fiduciary duty. The Court will deny Plaintiff's third motion for summary judgment on these grounds and need not resolve the additional arguments made by the parties at this time.[8]

### C.  Defendant's Motion to Dismiss (ECF No. 53)

Defendant argues that it is entitled under Federal Rule of Civil Procedure 37(d) to dismissal of all claims because Plaintiff has committed a series of willful, bad faith discovery

---

[8] Plaintiff filed a Motion to Certify Questions to the New Mexico Supreme Court (ECF No. 131) concerning whether an insurance company owes a fiduciary duty to its insured when handling a UIM claim and the respective burdens of proof. *See* Pl.'s Mot. to Certify 4, ECF No. 131. Plaintiff notes this issue is the subject of her first and third motions for summary judgment. Because this Court is resolving Plaintiff's third motion for summary judgment on the grounds that a dispute of fact exists as to the basis of the theory asserted, it need not determine at this time the underlying issue of whether a fiduciary duty exists, and if the question should be certified to the New Mexico Supreme Court. The Court will examine those issues, as necessary, in one or more subsequent opinion(s).

violations by making false statements and misleading omissions throughout her claim regarding her prior history of back and neck pain, and in submitting false interrogatory and deposition answers. Plaintiff argues that dismissal is not appropriate because she produced all her medical records and thus Defendant did not suffer prejudice from her answers to interrogatories. Plaintiff asserts that she gave Dr. Slaughter and Defendant information concerning her history of sciatica, which she contends is irrelevant to this litigation because the injuries caused by her car accident do not include sciatica, but rather neck and back pain of a different nature.

Federal Rule of Civil Procedure 37(d)(1)(A)(ii) permits a court to impose sanctions if a party, after being properly served with interrogatories, fails to serve its answers, objections, or written response. Rule 37(a)(4) states that "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4). Dismissal is an "extreme sanction appropriate only in cases of willful misconduct." *Ehrenhaus v. Reynolds*, 965 F.2d 916, 920 (10th Cir. 1992). A court must consider a number of factors before dismissing a case as a sanction: (1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; (3) the culpability of the party; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions. *Id.* at 921. The factors are not a rigid test, but only when the aggravating factors outweigh the judicial system's strong predisposition to resolve cases on their merits should a court dismiss a case as a sanction. *Id.*

The Court's review of the record reveals Plaintiff was, to be charitable, less than forthcoming concerning her medical history of back and neck issues in her responses. Plaintiff, in her answers to Interrogatory Nos. 9, 14, and 15, should have revealed more detail concerning her back and neck issues than she did. Plaintiff's stated reasons that she believed her back and

neck symptoms were of a different type than her sciatic symptoms amounts to hyper-technical, erroneous hair-splitting. Even Plaintiff's own expert Dr. Shelley believed that Plaintiff's answer to Interrogatory No. 15 was not accurate. The Court disagrees with Plaintiff that her medical history of sciatica is irrelevant such that she did not need to disclose her medical history of back and neck issues. That said, in her response, Plaintiff elsewhere revealed the names of her prior medical providers and she disclosed that Dr. Alan Rogers from 2004-2006 treated her for "general medical needs and also referred to the pain clinic for sciatic nerve pain where [she] received injections on 2 occasions." She had also given some, albeit minimal, information to Metropolitan that she had a history of sciatica during the claims process. She therefore did not fully conceal her medical history concerning back issues. Significantly, the very next day after responding to the interrogatories, Mr. Mescall hand-delivered copies of Plaintiff's medical records, and those records contained information concerning her medical history of back pain and neck issues. Metropolitan was thus not forced through its own efforts to obtain the relevant medical records. Consequently, the degree of actual prejudice to Defendant, the amount of interference with the judicial process, and the lack of notice do not warrant the extreme sanction of dismissal. Defendant admits that factors 2, 4, and 5 "are not [] implicated to a great extent by the facts of this case." Def.'s Mot. 16, ECF No. 53.

The Court is convinced that lesser sanctions could deter the conduct of which Defendant complains and would be more just and proper here. For example, a more appropriate sanction might be attorney's fees expended in the extra time spent reviewing the medical records for the information Plaintiff should have more clearly disclosed in the interrogatories or in the time necessary for Defendant to discover her history of chiropractic care. Defendant, however, has not moved for lesser sanctions, instead hoping for a "homerun" sanction. The Court, however, finds

that the sanction of dismissal is not warranted because the facts do not outweigh the strong interest in resolving cases on their merits. Notably, one of the substantive issues in this case is whether Plaintiff violated the fraud provision in the Policy, and thus, many of the facts underlying the instant motion to dismiss are relevant to the affirmative defense in the case. The Court therefore will deny Defendant's motion to dismiss as a sanction.

**IT IS THEREFORE ORDERED** that

1. Plaintiff's Motion to Strike Dr. Slaughter Affidavits (Doc. 46-1 & 47-1) (**ECF No. 56**) is **DENIED**.

2. Plaintiff's Third Motion for Partial Summary Judgment (Count II—Breach of Fiduciary Duty) (**ECF No. 95**) is **DENIED**.

3. Defendant's Motion to Dismiss for Willful and Bad Faith Discovery Violations and Authorities in Support (**ECF No. 53**) is **DENIED**.

**UNITED STATES DISTRICT JUDGE**