## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**TERESA WILLIAMSON,**

      **Plaintiff**

**v.**                                   **No. 1:15-CV-958 JCH/LF**

**METROPOLITAN PROPERTY AND
CASUALTY INSURANCE COMPANY,**

      **Defendant.**

### MEMORANDUM OPINION AND ORDER

This matter comes before the Court on the following motions: (i) Plaintiff's First Motion for Partial Summary Judgment (Count II—Breach of Fiduciary Duty) (ECF No. 9); (ii) Plaintiff's Second Motion for Partial Summary Judgment (Count V—Violation of Unfair Practices Act) (ECF No. 12); (iii) Defendant's Motion for Summary Judgment on the Grounds of Plaintiff's Breach of Insurance Policy by Fraud (ECF No. 102); (iv) Plaintiff's Motion to Certify Questions to the New Mexico Supreme Court (ECF No. 131); and (v) Plaintiff's "Motion to Allow Filing of 'Plaintiff's Motion to Certify Questions to the New Mexico Supreme Court' [Doc. 131]" (ECF No. 133). The Court, having considered the motions, briefs, evidence, and relevant law, will grant the motion to allow the filing of the motion to certify out of time, but will deny the motion to certify on the merits, and will deny the parties' motions for summary judgment.

## I.      FACTUAL BACKGROUND

### A.  Car Accident and Uninsured/Underinsured Policy

Ms. Williamson was involved in a car collision on April 27, 2012, in which she was rear-ended. *See* Independent Medical Evaluation ("IME") Report 2, ECF No. 9-1; Aff. of Horace

Williamson ll. 9-11, ECF No. 9-1; Pl.'s Third Mot. for Summ. J., Undisputed Fact ("UF") ¶ 1, ECF No. 95. The at-fault driver's insurance company was American National Property and Casualty Company ("ANPAC"). *See* Letter dated July 14, 2015, ECF No. 9-1 at 14 of 18; Def.'s Resp. to Pl.'s Third Mot. for Summ. J. 1, ECF No. 96. On May 1, 2012, Ms. Williamson had a recorded telephone conversation with Mara Bell, Claims Adjuster for ANPAC, in which she informed Ms. Bell she was experiencing spasms in her right arm and shoulder, through her shoulder and neck. *See* May 1, 2012 Tr., ECF No. 53-1 at 1-2 of 33. When asked if she had ever before had any previous injuries to the areas she mentioned, Ms. Williamson replied, "Not on my shoulder and neck. On my leg, on the right leg I had a knee surgery a year ago." *Id.* at 3 of 33.

At the time of the collision, Ms. Williamson was insured by Metropolitan Property and Casualty Company ("Metropolitan"), which provided uninsured/underinsured motorist coverage. Compl. ¶ 7, ECF No. 1-2; Answer ¶ 7, ECF No. 7. The policy with Metropolitan provided $10,000 in MedPay coverage and $250,000 in underinsured motorist coverage ("UIM"). Pl.'s First Mot. for Summ. J., UF ¶ 3, ECF No. 9. The UIM component of the Policy, however, did not provide coverage for bodily injury "due to or resulting from an accident which occurred before the effective date of this coverage." Endorsement NM400B ¶ H, ECF No. 102-2 at 2 of 2.

Plaintiff's insurance policy with Metropolitan has a "Fraud and Misrepresentation" provision that states:

> All coverages under this policy are void if, whether before or after a **loss**, **you** or any person seeking coverage has:
> a. concealed or misrepresented any material fact or made any fraudulent statements; or
> b. in the case of any fraud or attempted fraud, affected any matter regarding this policy or any **loss** for which coverage is sought.

Policy ¶ 3, ECF No. 102-2 at 1 of 2 (bold in original).

On April 15, 2013, Mary Sadousky, a Claims Investigator with Metropolitan, interviewed Ms. Williamson. *See* April 15, 2013 Tr., ECF No. 53-1 at 4-6 of 33. Ms. Williamson reported she developed pain "all in [her] back" about five days after the accident. April 15, 2013 Tr., ECF No. 102-4 at 1-2 of 6. Ms. Williamson reported that Dr. Roche, her primary care physician, treated her after the accident, addressing the pain she was experiencing all the way down to her tailbone. *See* April 15, 2013 Tr., ECF No. 102-4 at 2-3 of 6. Ms. Sadousky asked if anything outside of the accident could have injured her tailbone, to which Ms. Williamson responded that Dr. Roche did an x-ray, said her tailbone was not broken, and believed the muscles around that area were really tender. *Id.* Ms. Sadousky then inquired, "And, and he wasn't thinking that you had, uh, a disk problem, or did he?" *Id.* Ms. Williamson said, "No." *Id.* Ms. Sadousky later asked Ms. Williamson if she had ever been injured at work, like slipping or falling, to which Ms. Williamson responded that she fell on her back 20 years ago, was treated by a doctor, but she got to a point where that pain was gone. *See id.* at 4 of 6. Ms. Sadousky then asked Ms. Williamson if in the last five years she had seen a chiropractor before, to which Ms. Williamson replied, "Never." *Id.* at 5 of 6. Ms. Sadousky asked if Dr. Roche had ever treated her because she was having problems with her back or neck. *See id.* Ms. Williamson responded, "Um, I, I was, but not even treated, but I was, uh, one, I had a sciatic pain sometimes…. And I don't know if he ever treat for that, uh, maybe not. I get the massage, a massage sometimes where it happen 'cuz…" *Id.* When asked if there was anything about the accident, her injury, and her condition that she would like Metropolitan to know, Ms. Williamson responded, "No, no, you have been very thorough." April 15, 2013 Tr., ECF No. 102-4 at 6 of 6.

## B.     Plaintiff's Underinsured Motorist Claim

Plaintiff made a claim with Metropolitan for medical payments coverage ("MedPay") after the accident. *See* Aff. of Horace Williamson ll. 9-13, ECF No. 9-1; Answer ¶ 12, ECF No. 7. On January 30, 2013, Metropolitan received signed medical authorizations from Ms. Williamson. Pl.'s Ex. B, ECF No. 106-2. As part of the claims process, Metropolitan required Plaintiff to undergo an Independent Medical Examination ("IME"). *See* Compl. ¶ 12, ECF No. 1-2; Answer ¶ 12, ECF No. 7.

Plaintiff contends that Metropolitan required she undergo the IME as a prerequisite to paying her MedPay benefits. *See* Aff. of Horace Williamson ll. 12-13, ECF No. 12-1. Defendant disputes this latter contention, arguing that the MedPay benefits were temporarily delayed to allow it time to obtain medical records and an IME to determine if the treatment was related to the accident, reasonable, and necessary. *See* Def.'s Resp. to Pl.'s Second Mot. for Summ. J. 4, ECF No. 26.

Metropolitan's MedPay adjuster selected and hired the Medical Examiner, an Orthopedic Surgeon, Dr. Douglas Slaughter, to examine Ms. Williamson. Pl.'s First Mot. for Summ. J., UF ¶¶ 5-6, ECF No. 9. The medical examination took place on October 18, 2013. *Id.* UF ¶ 7; IME Report, ECF No. 9-1 at 4 of 18. Ms. Williamson reported to Dr. Slaughter that the day after the car collision she began experiencing neck and low back pains and listed her medical care following the collision, including medical providers Dr. Roche, Physical Therapist Kern, and Dr. Emil Cheng. *See* IME Report 2-5, ECF No. 9-1 at 5-6 of 18. She complained to Dr. Slaughter of "neck pain, neck spasm, and low back pain." *Id.* at 3. During the IME, Plaintiff informed Dr. Slaughter that she had no back and neck pain symptoms prior to the April 2012 collision. Dep. of Teresa Williamson 103:5-17, ECF No. 53-1; Aff. of Dr. Slaughter ¶ 5, ECF No. 46-1.

Dr. Slaughter reviewed x-rays Plaintiff brought from Dr. Roche. *See* IME Report 2, 4, ECF No. 9-1. He also reviewed her medical records, the first of which was dated May 9, 2012. *See id.* 4-5. Dr. Slaughter noted that he reviewed medical records that Plaintiff had provided from Plaintiff's visit to Dr. Cheng on April 30, 2013 at New Mexico Orthopaedics for neck, mid back, and low back pain. *See id.* at 5; Def.'s Resp., Ex. 1, ECF No. 18-1 at 1 of 7; Aff. of Teresa Williamson, ECF No. 60-4. In Dr. Cheng's report, Dr. Cheng had noted that Plaintiff "reports having a history of right sciatica," she was involved in a motor vehicle accident in April 2012, she noticed pain in May 2012, and she "is not sure if her symptoms are related to the motor vehicle accident." Def.'s Resp., Ex. 1, ECF No. 18-1 at 1 of 7.

After completing the IME, Dr. Slaughter reported, as relevant here, the following in response to Metropolitan's questions:

**2.      Based on the records provided, what is the typical, necessary treatment, frequency, and duration of care for an injury of this type?**

This is a soft tissue injury. In the past, it has been shown that cervical whiplash injuries can last up to two years with a minority lasting longer than that as far as symptoms are concerned. The claimant obviously by MRI does have some degeneration of the cervical and lumbar spine. This will be an ongoing issue as far as treatment and symptoms. In her physical therapy and chiropractic notes, she had what is typical for degenerative conditions which is waxing and waning of symptoms without any significant long term improvement.

…

**3. Has the claimant's condition stabilized to a point where he/she has received maximum benefit from medical and/or chiropractic care?**

The claimant has undergone a significant amount of chiropractic care and has ceased this on her own. She has also undergone massage therapy, as well as physical therapy. She can definitely have her own exercise program and does not need further physical therapy. Chiropractic treatment also does not need to be explored further. *However, if the claimant has done relatively well from her single set of facet blocks, radiofrequency ablation may be beneficial to alleviate her pain for much longer periods of time.* She has not undergone any cervical injections to see if this helps to alleviate her symptoms. She *may* be a good candidate for cervical facet blocks and radiofrequency ablation on a periodic basis as well.

…

**4.      Does the claimant currently require further medical and/or chiropractic treatment or diagnostic studies for the condition resulting from the accident(s)? If so, please specify type, frequency, and duration.**

As stated above, the claimant has disc degeneration and facet arthropathy. The diagnosis related to the motor vehicle collision, including whiplash associated disorder at the cervical spine. In addition, the claimant does have or has an exacerbation of her degeneration in the lumbar spine. *It is felt that this claimant could undergo further lumbar facet blocks and potential radiofrequency ablation to assist in the pain relief from her degeneration which reportedly she was asymptomatic from prior to the motor vehicle collision. This could also be a reasonable treatment in the cervical spine.* However, Dr. Cheng has not been able to ascertain whether epidural injections or facet blacks are going to be most beneficial for her cervical pain. As far as the cervical pain is concerned, I would suggest that she have the appropriate injection approximately two to three times per year *as needed for pain relief….* The injections in the lumbar spine would also be approximately two to three times per year *based on symptom reduction.*

**5.      Re: Causation, within a reasonable degree of medical certainty, when could have (or can) the condition that relates to the accident in question be considered resolved, requiring no further care? Does the medical documentation support a causal relationship between the accident in question and the injuries sustained?**

*Regarding causation, the claimant definitely had a pre-existing degenerative condition in both the cervical and lumbar spine.* It is felt by this examiner that *she has had an exacerbation or a permanent aggravation of her cervical degeneration and lumbar degeneration.* No further injury has obviously been sustained in the motor vehicle collision. The injuries, unfortunately, can be *persistent.*

…

## DIAGNOSES RELATED TO THE MOTOR VEHICLE COLLISION

1. Cervical spondylosis without myelopathy or facet joint degeneration, exacerbation/aggravation.
2. Cervical disc degeneration/aggravation/exacerbation.
3. Lumbar disc degeneration, aggravation/exacerbation.
4. Lumbar facet arthropathy/lumbar spondylosis without myelopathy, aggravation/exacerbation.

IME Report 7-9, ECF No. 9-1 (italics emphasis added).

Metropolitan subsequently paid Plaintiff $10,000 for medical payments pursuant to the

MedPay benefits in the Policy. *See* Aff. of Horace Williamson ll. 17-19, ECF No. 9-1 at 1 of 18;

Def.'s Resp. ¶ 14, ECF No. 18. On March 13, 2015, Plaintiff settled for $43,000 her third-party claim against the at-fault driver, who had an insurance policy limit of $50,000. *See* Pl.'s First Mot. for Summ. J., UF ¶ 15, ECF No. 9.

On July 14, 2015, Thomas Mescall, counsel for Plaintiff, sent Metropolitan a letter notifying it of the settlement of her third-party claim and offering to settle her first party underinsured claim for $207,000. Letter dated July 14, 2015, ECF No. 9-1 at 14 of 18. In the letter, counsel stated that the $43,000 settlement barely covered Ms. Williamson's past medical expenses, and thus, failed to compensate her for past pain and suffering, future pain and suffering and future medical payments. *Id.* Counsel attached the IME Report and included copies of past medical bills, asserting that the total amount for past medical treatment was $37,125. *See id.* at 14-16 of 18. Mr. Mescall attached medical records and bills for post-accident treatment from Dr. Roche, Terry Kern Physical Therapy, Michelle Emberger, Soothing Hands Massage, and NM Orthopaedics. *Id.* at 16 of 18. The records included a print-out of medical treatment from New Mexico Orthopaedics, beginning in July 1, 2011, which listed treatments for "Lumbago" and treatment by Dr. Christopher Patton. Pl.'s Ex. G, ECF No. 106-7. In his letter, Mr. Mescall based his past medical treatment cost on treatment beginning on May 9, 2012, with the last listed date of treatment as December 29, 2014. Letter dated July 14, 2015, ECF No. 9-1 at 16 of 18.

In explaining the reasons behind the settlement offer, Mr. Mescall asserted that Dr. Slaughter recommended future medical treatment of cervical facet blocks and lumbar facet blocks; Plaintiff had a cervical facet block at a cost of $3,893 and lumbar facet blocks ranging in cost from $4,132 to $9,967; and calculating two to three of each block per year for her life expectancy of over 30 years, her future medical costs would exceed the UIM policy limits (giving, for example, the amount for three cervical facet blocks per year for 30 years as $342,000

and $371,880 for three lumbar facet blocks per year for 30 years, at the low end of the cost range). *See id.* at 15-16 of 18.[1] Mr. Mescall concluded that Ms. Williamson was entitled to 100% of her damages because "the uncontradicted medical records and the uncontradicted testimony establish[] that Ms. Williamson was asymptomatic at the time of the 2012 car collision." *Id.* at 17 of 18.

Jacob Martinez, a Senior Claims Adjuster employed by Metropolitan, was assigned to Plaintiff's claim. Aff. of Jacob Martinez ¶¶ 2-4, ECF No. 18-1 at 5 of 7. Mr. Martinez reviewed Plaintiff's settlement demand letter, including the medical bills from May 9, 2012 through December 29, 2014. *See id.* ¶¶ 6-8. Metropolitan did not receive any additional medical records or bills about treatments from Plaintiff or her counsel during 2015. *See id.* Metropolitan asserts it evaluated Plaintiff's claim to be approximately $50,000 to $56,000, relying on the assumption that Plaintiff had ended medical treatment in December 2014 and, therefore, it did not consider any future medical costs in the evaluation. *See id.* ¶¶ 8-9.

By letter dated August 21, 2015, Mr. Martinez informed Mr. Mescall: "As discussed in our conversation of 08/21/2015, we offer a settlement of $1000 for your client's bodily injury claim." Letter dated Aug. 21, 2015, ECF No. 96-1 at 3 of 6. Mr. Martinez gave no written explanation in the letter for the settlement offer amount. *See id.* Metropolitan's offer occurred in the regular course of its insurance business. Pl.'s Second Mot. for Summ. J., UF ¶ 31, ECF No. 12. Metropolitan contends that it was a reasonable settlement, because it paid $10,000 in MedPay to Plaintiff, and she received $43,000 from the other driver. *See* Aff. of Jacob Martinez ¶¶ 10-12, ECF No. 18-1 at 6 of 7. Plaintiff disputes the reasonableness of the offer.

---

[1] Defendant disputes the basis for counsel's calculations and assertions made in his letter.

## D. Subrogation of MedPay[2]

The UIM Policy contains a provision that reduces the amount paid to the insured by any amount paid under the Medical Expense sections of the Policy. *See* Endorsement NM400B, ECF No. 96-1 at 6 of 6. On October 16, 2014, Shannon Kelly, a Subrogation Adjuster for Metropolitan, wrote counsel for Plaintiff the following: "You were previously put on notice of our subrogation rights for the 1st party benefits paid on behalf of your client. Please provide a status of our subrogation claim." Letter dated Oct. 16, 2014, ECF No. 100-1. On September 21, 2015, Mr. Mescall wrote Ms. Gauthier a letter asserting the reasons under New Mexico law why Metropolitan was not entitled to subrogation because Plaintiff had not been fully compensated when she settled her third-party claim against the at-fault driver. *See* Pl.'s Ex. C, ECF No. 34-2. According to a note in the claim file, on September 23, 2015, Margaret Gauthier, a Supervisor for Metropolitan, wrote "it looks like you have taken the offset of the 10K in amp subro in AUU evaluation along with the tort limits – please confirm you have used this in their eval and are waiving our subro – thanks!" Pl.'s Ex. B, ECF No. 34-3; Pl.'s Ex. D, ECF No. 34-3. The next note in the claim file is dated September 24, 2015 from Mr. Martinez to Ms. Gauthier, stating, "I discussed this matter with Management and we are not waiving subro. And please keep me updated if there is a payment or rejection from American National." Pl.'s Ex. B, ECF No. 34-1. By letter dated October 6, 2015 from Ms. Gauthier, Metropolitan informed Plaintiff that it was agreeing to waive its MedPay subrogation. Pl.'s Ex. D, ECF No. 34-3.

---

[2] Many of the facts concerning the subrogation issue Plaintiff raised for the first time in her reply in support of her First Motion for Partial Summary Judgment. Defendant filed a Sur-reply, arguing that the Court should strike the facts raised for the first time in the reply. Def.'s Sur-reply 2-3, ECF No. 46. Following the completion of briefing on the first partial motion for summary judgment, Plaintiff filed her Third Motion for Partial Summary Judgment, setting forth the same facts regarding subrogation, and Defendant filed a response disputing the facts. *See* Pl.'s Third Mot. 7-8, ECF No. 95; Def.'s Third Resp. 3-5, ECF No. 96. Because Defendant had subsequent opportunity to address the facts, the Court will not strike the facts set forth in Plaintiff's reply and will consider the full record in considering the multiple motions before it.

Plaintiff argues that Metropolitan unlawfully demanded subrogation for her MedPay benefits, and that the $1,000 settlement offer was conditioned on having to repay Metropolitan's subrogation claim for $10,000. Pl.'s Third Mot. ¶ 3, ECF No. 95 at 7 of 9. Defendant disputes this fact, arguing instead that the internal claim file note referred to waiving subrogation against ANPAC based on the $7,000 remaining under ANPAC's policy. *See* Def.'s Resp. 3-4, ECF No. 96. Mr. Martinez avers that it "was never my intention to not waive subrogation with respect to the insured" and he never discussed subrogation issues with Mr. Mescall. Aff. of Jacob Martinez ¶¶ 7, 9, ECF No. 96-1.[3]

### E. Complaint and Interrogatories

On September 22, 2015, Plaintiff filed suit against Metropolitan for breach of its insurance duties. Compl., ECF No. 1-2. In Count I, Plaintiff alleges Defendant breached its contractual duty to provide underinsured coverage by offering only $1,000 for her past pain and suffering, future pain and suffering, and future medical payments. Plaintiff asserts in Count II and III that Defendant breached its fiduciary duty and breached the covenant of good faith and fair dealing, respectively, by requiring her to undergo an IME, then refusing to accept the medical examiner's findings that she would require future medical treatment that would exceed policy limits and offering her only $1,000, thereby subjecting her to a needlessly intrusive medical examination. In Count IV, Plaintiff claims a violation of New Mexico's Unfair Insurance Practices Act by unreasonably subjecting her to an intrusive and irrelevant IME as an abusive tool to delay processing her claim and by offering her a frivolous and unfounded offer of only $1,000. Finally, Plaintiff alleges in Count V a violation of the Unfair Practices Act ("UPA")

---

[3] To support its argument that the reference to not waiving subrogation of MedPay was regarding the other insurer, not Plaintiff, Defendant cites statements from the Affidavit of Jacob Martinez, ECF No. 96-1. Plaintiff contends that Mr. Martinez was a claims adjustor in Dallas who does not have personal knowledge about the actions taken by Metropolitan's subrogation department in North Carolina. *See* Pl.'s Reply 2-3, ECF No. 100.

by falsely implying that $1,000 was sufficient to compensate her, thereby failing to deliver the quantity of services for which she contracted.

On November 20, 2015, Metropolitan sent Plaintiff its first set of interrogatories and first requests for production. Certificate of Service, ECF No. 10. On January 6, 2016, Metropolitan received Plaintiff's Answers to Defendant's First Set of Interrogatories. Def.'s Ex. 5, ECF No. 53-1 at 19-23 of 33. Interrogatory No. 9 asked for the complete details of her physical and mental medical history prior to the accident, including the names and addresses of all medical providers and the purpose of each treatment. *Id.* at 20-21 of 33. For the time period prior to the accident and as relevant here, Plaintiff listed, among others, Dr. Clare Castiglia as a primary care physician; Dr. Richard Roche as a primary care physician for general medical needs; Terry Kern for physical therapy after knee surgery; Dr. Frank Heckl for her knee surgery; Dr. Valerie Talento for pain treatment; Dr. Alan Rogers from 2004-2006 for "general medical needs and also referred to the pain clinic for sciatic nerve pain where I received injections on 2 occasions." *Id.* at 21-22 of 33. In response to Interrogatory No. 14 for a list of all injuries, complaints, and symptoms that she claims to have sustained as a result of the accident, Plaintiff responded, "I have been experiencing severe pains in my lumbar and cervical regions…. I have difficulty sitting or walking for the extended periods that I used to be able to prior to the accident…" *Id.* at 23 of 33. Interrogatory No. 15 inquired if any of the injuries complained of constitute an aggravation of a pre-existing condition, and asked her to describe the pre-existing condition that was aggravated and list medical providers who gave treatment for the pre-existing condition. *Id.* Plaintiff responded, "I am not aware of any pre-existing conditions as I had not had treatments

prior to the accident for pain in my cervical or lumbar regions." *Id.* She listed no treatment providers. *Id.*[4]

On January 7, 2016, Mr. Mescall hand delivered to Metropolitan her responses to its requests for production. *See* Def.'s Ex. 8, ECF No. 75-1 at 2 of 9.

### F. Past Medical Records

Metropolitan discovered the following information within the medical records. On July 6, 2004, Plaintiff saw Dr. Alan Rogers for chest pains and a history of diabetes, and among other things, he noted "Sciatica … Old problem. Uses Ibuprofen OTC." Def.'s Ex. B, ECF No. 47-1 at 14-15 of 62. On October 31, 2005, she came to Dr. Rogers for a follow up visit for sciatica, which she described as "[w]orse for 2 months" and "severe" and that it hurt to move her right leg. *Id.* at 20 of 62. She reported having back problems off and on for five years, which she said resolves on its own. *Id.* Dr. Rogers ordered an MRI of her lumbar spine because of her sciatica. *See id.* at 23 of 62. The MRI showed "6 lumbar type vertebral bodies," a "small central disk protrusion impressing upon the thecal sac at L4-5 without neural impingement," and "mild facet arthritis at bilaterally at L5-L6 and L6-S1." *Id.* On a January 31, 2006 visit, Dr. Rogers noted Plaintiff had an "extra lumbar vertebra and also facet arthritis" [sic], pain in her low back and into her right buttock, and he referred her to Dr. Paul Fullerton at the Pain Clinic for her sciatica and low back pain. *See id.* at 26-28 of 62.

On March 7, 2006, Dr. Fullerton gave Plaintiff a transforaminal L5-6 right epidural steroid injection. *Id.* at 29 of 62. Dr. Fullerton diagnosed internal disc disruption, degenerative disc disease, and facet arthropathy, and he discussed a treatment plan with her and her husband.

---

[4] Plaintiff made similar responses in the underlying state case when answering ANPAC's interrogatories. *See* Def.'s Ex. 3, ECF No. 53-1 at 7-12 of 33.

*Id.* at 29-30 of 62. Dr. Fullerton gave Plaintiff another transforaminal epidural steroid injection at L5-6 on April 27, 2006, because of ongoing pain, "primarily lower back," and radiating down into her right leg, which he believed arose from the small disc protrusion at L4-5 and unlikely associated with her facet arthritis. *See id.* at 32 of 62.

On May 29, 2007, Plaintiff saw Dr. Clare Castiglia, reporting among other symptoms that her shoulders had been aching for one or two weeks, achiness Plaintiff believed was caused by one of the drugs she was taking. *See id.* at 36-37 of 62. On July 27, 2007, Plaintiff reported to Dr. Castiglia, among other symptoms, that she still had shoulder pain, but described it as very intermittent. *Id.* at 38-39 of 62. Plaintiff had a follow-up appointment with Dr. Castiglia on October 23, 2007, and stated that she had, among multiple other symptoms, "some back pain" and pointed to her lower thoracic in the flank area, which she said hurts more when she sits too long or wrong, and she reported "chronic hip pain in the past." *Id.* at 40 of 62. Dr. Castiglia noted that Plaintiff had definite pain when she side bent to the left and told her she believed the back pain "is mechanical, more muscular." *Id.*

On February 14 and May 16, 2008, Plaintiff presented to massage therapist Linda S. Duty, LMT, MMP, at Soothing Hands Massage with right hip and left arm pain, and received treatment focused on the left scapular, gluteal and right quadratus lumborum regions. *See* Def.'s Ex. 9, ECF No. 75-1 at 3 of 9.[5]

On March 19, 2009, Plaintiff had a follow-up with Dr. Roche, reporting numerous symptoms including intermittent chest discomfort and "some pain in her shoulders." Def.'s Ex. B, ECF No. 47-1 at 42 of 62.

---

[5] Defendant presents other records from Ms. Duty showing additional massages. The Court agrees, however, with Plaintiff's argument that it is not clear when the therapy notes list "back – neck – hips" that Plaintiff was reporting pain in those areas, and thus, will not find that purported fact to be undisputed.

In 2011, she went to New Mexico Orthopaedics for knee pain, had knee surgery, and underwent physical therapy sessions with Terry Kern. *See id.* at 44, 50, 53 of 62. Her physical therapist reported that Plaintiff's "persistent pelvic and hip instability caused by the iliacus could also explain her history of sciatic symptoms." *Id.* at 50 of 62. On a July 27, 2011 visit, Mr. Kern noted "isolated upper cervical instability." Def.'s Ex. 7, ECF No. 75-1 at 1 of 9. Mr. Kern referred her to Dr. Christopher Patton, believing that if she improved the stability of her pelvic and hip, she could make full recovery with her knee. Def.'s Ex. B, ECF No. 47-1 at 53 of 62. He noted she has a history of what she calls sciatica pain on the right. *Id.*

On August 8, 2011, Plaintiff went to Dr. C. A. Riekeman, a chiropractor, for hip pain, noting it was difficult to walk after her knee surgery. Pl.'s Ex. A, ECF No. 60-1 at 1 of 6. In her medical record for the visit, when asked to check all the symptoms she has now or has had previously, under "Muscles & Joint Symptoms," Plaintiff checked "backache," "painful tail bone," and "pain between shoulders." *Id.* at 2 of 6.

On August 18, 2011, Plaintiff saw Dr. Patton at New Mexico Spine for her "hip problem" after knee surgery. Def.'s Ex. B, ECF No. 47-1 at 54 of 62. In a body diagram, she charted pain in the hip and knee areas. *See id.* She rated back pain as 6 out of 10 in severity. *See id.* Under previous treatments, she listed physical therapy, massage, and "once" for chiropractor. *Id.* at 55 of 62. Under "Previous Treatments for Pain," Dr. Patton noted that Plaintiff had been followed at the Santa Fe Pain Clinic for low back symptoms and had shots. *Id.* at 56 of 62. She stated during the visit that she was having more pain in the right buttock and right lateral hip that was "constant and worsening." *Id.* He had an x-ray evaluation performed, noting "lumbarization of the S1 vertebral body with six lumbar type vertebrae." *Id.* Dr. Patton believed that the knee

surgery most likely contributed to her walking difficulty that contributed to the development of greater trochanteric bursitis. *Id.* at 57 of 62.

On September 28, 2011, Dr. Valerie Talento at the Talento Acupuncture Clinic saw Plaintiff for help with her "sciatic nerve/R. Leg – Lower back pain" and right knee problem. Def.'s Ex. 4, ECF No. 53-1 at 14 of 33. Plaintiff stated that the problem started ten years ago and that she had tried treatments of massage and injection for pain. *Id.* On a subsequent visit on September 29, 2011, chronic sciatica was noted. *Id.* at 18 of 33.

On November 29, 2011, Plaintiff in a medical appointment reported having "LB pain indicating the spine" but was "using aspercream which helps." Def.'s Ex. B, ECF No. 47-1 at 62 of 62.

### G. Post-Accident Treatment

On January 23, 2013, Dr. Roche examined Ms. Williamson, diagnosed her with neck pain with osteoarthritis, and referred her to N.M. Spine and Dr. Cheng. Def.'s Ex. E, ECF No. 102-5.

Ms. Williamson received an injection on December 26, 2014. Aff. of Horace Williamson ll. 4-7, ECF No. 34-4. She received a lumbar facet block injection on September 2, 2015, and a cervical facet block injection on December 14, 2015. *Id.* Plaintiff continues to receive cervical and lumbar facet blocks. Aff. of Horace Williamson l. 11, ECF No. 12-1 at 2 of 3.[6]

On November 17, 2015, Dr. Robin Hermes from New Mexico Orthopaedics saw Ms. Williamson for mid back pain after a motor vehicle accident, stating in her medical record from

---

[6] Defendant disputes this fact because it has not received records of such treatment, it has not had an opportunity to cross examine either Plaintiff or her husband, and Plaintiff did not make it aware she was receiving additional treatments when they were negotiating the settlement of the UIM claim. *See* Def.'s Resp. to Pl.'s Second Mot. for Summ. J. ¶ 25, ECF No. 26 at 7 of 17. Although Defendant has not deposed Mr. or Mrs. Williamson, it did not request an opportunity to depose them under Rule 56(d) prior to the Court ruling on the motions. Because Mr. Williamson's affidavit is evidence, the Court may consider it at this stage in the proceedings, but ultimately, the fact is not relevant to the Court's determination of the motions.

the visit there was a history of prior injury to this mid back. Def.'s Ex. H, 102-8 at 1 of 5. Dr. Hermes examined Plaintiff again on January 5, 2016. *Id.* at 5 of 5. In her chart, Dr. Hermes noted that Plaintiff "would like it specified that she has had no prior injury to her back or neck prior to the car accident that occurred in 2012. There was a statement in her initial visit that stated 'there was prior injury to her back' but this actually referred to her car accident." *Id.*

### H. Plaintiff's Deposition Testimony

At her deposition, Ms. Williamson acknowledged understanding that she had a duty to be honest with her insurance company and that withholding relevant information her insurance company needs to evaluate a claim may constitute fraud. *See* Dep. of Teresa Williamson 11:24-12:12, 16:6-10, ECF No. 53-1. Plaintiff testified to understanding what fraud means, stating fraud is "being nontruthful." *Id.* 12:16-22. Plaintiff stated she relied on her lawyers to send Defendant all her medical records. *See id.* 51:22-52:24. Ms. Williamson understood that the purpose of the IME was for the insurance company to fully understand her medical condition, so it could decide whether to pay the medical payments under the policy. *Id.* 101:20-102:13.

When defense counsel asked if she thought Metropolitan was entitled to look at her medical records showing the 10-year history of low back pain, she responded, "They could ask for them." *Id.* 58:10-14. Ms. Williamson explained, however, that she was asymptomatic prior to the accident and that she did not commit fraud because she had sciatic pain "which is different than the back pains that I have now." *See id.* 57:17-58-9. Ms. Williamson stated that she probably told Dr. Slaughter that she did not have symptoms in her back or neck prior to the accident, explaining that she had told Metropolitan about her history of sciatic pain, she understood that Metropolitan would send Dr. Slaughter what they had regarding her claims, and

she believed the back pains from the accident were different from the sciatic pain. *See id.* 103:15-104:19.

Later, Ms. Williamson admitted that she had seen a chiropractor in 2011. *Id.* 85:2-4.[7] Defense counsel asked Ms. Williamson about the answers she gave to ANPAC on May 1, 2012, and why she did not mention complaints to her doctors about shoulder pain in 2007 and 2009 or her history of sciatica. *See id.* 90:15-96:25. Plaintiff responded, "Don't ask, don't tell." *Id.* 93:25-94:2. She additionally indicated that Ms. Bell asked about "previous injuries" and she did not have an injury; her shoulder and neck issues were not injuries for which she had any treatments. *See id.* 93:19-95:11. Plaintiff explained that her doctor believed that some of the medications she was taking were causing the muscle pains, and indicated that the neck pain she had now is not of the same type. *See id.* 95:3-96:14. Ms. Williamson denied having prior injuries to her neck, referring to her prior symptoms as "stress pains." *Id.*

Defense counsel stated that Plaintiff did not tell Ms. Sadousky about her history of back pain and sciatic pain, injections, and things of that nature, and asked, "You don't say anything about any of that in your statement to Ms. Sadousky here, do you?" *Id.* 85:21-86:1. Plaintiff replied, "No. She asked have you been treated with him because you were having problems with your back or neck. My back and my neck were not hurting. Was my sciatic pain that was hurting. It was my sciatica." *Id.* 86:2-6.

During her deposition, Plaintiff testified she intentionally lied to Dr. Cheng on April 30, 2013 by falsely claiming she was not sure if her spinal symptoms were related to the accident

---

[7] Plaintiff asserts that she explained in her deposition that she forgot about the chiropractor visit, and promptly submitted the record to Metropolitan when she remembered. Pl.'s Resp. to Def.'s Mot. for Summ. J. ¶ J, ECF No. 106. Although the Court could not find in the record the portion of her deposition supporting this proffer, Defendant did not dispute that Plaintiff testified to having forgotten the visit when explaining why she told Ms. Sadousky she had never seen a chiropractor. Instead, Defendant argued that Plaintiff's Fact J has no material bearing on the resolution of the motion. However, at the summary judgment stage, the Court must construe the record in favor of the non-moving party, so when construing Defendant's motion for summary judgment, the Court will consider the fact that Plaintiff testified to having forgotten about her one visit to see a chiropractor.

because he did not see patients with injuries caused by car accidents. *See* Def.'s Mot. for Summ. J., UF ¶¶ 31-33, ECF No. 102. She waited two treatments to reveal that she had initially lied to him to alleviate his concerns he might have to testify as a witness. *See id.* On March 6, 2015, Dr. Cheng charted that Plaintiff recalled her pain starting two days after the April 2012 motor vehicle accident. Def.'s Ex. F, ECF No. 102-6. Plaintiff explained she lied because New Mexico Orthopaedics will not see patients whose symptoms relate to car accidents, but she knew that Dr. Cheng was a very good doctor. Dep. of Teresa Williamson 107:12-109:8, ECF No. 106-5.

## I. Affidavit of Dr. Slaughter

On January 19, 2016, Dr. Slaughter signed an affidavit stating that in preparing his prior IME, he did not intend to imply that Mrs. Williamson "required" three injections in either her cervical spine or lumbar spine per year. Aff. of Dr. Slaughter ¶ 12, ECF No. 47-1. He explained that his IME was based on information Mrs. Williamson provided him at the time, and that she reported she had no symptoms in her back or neck prior to the car accident. *Id.* ¶¶ 4-5.

He further attested that, subsequent to his IME of Plaintiff, he was given and reviewed prior medical records for Plaintiff suggesting that she did in fact have a long history of prior back and neck symptoms, dating at least to 2004, records that were not made known to him prior to the IME. *Id.* ¶¶ 6, 11. He noted the records indicate she has had mechanical symptoms in her low back with radiating pain in the right lower extremity intermittently and a history of neck pain. *Id.* ¶ 7. He stated: "These records also reveal Mrs. Williamson has been treated with spinal injections in 2006 and 2011." *Id.* Based upon his review of the additional information, he now believes she does not warrant any further treatment as a result of the April 2012 vehicle accident. *Id.* ¶ 13.

Plaintiff asked her expert, Dr. Brian M. Shelley, to review Dr. Slaughter's IME, his subsequent Affidavit, and the medical records upon which Dr. Slaughter relied. *See* Medical Record Review Report 3, ECF No. 56-1. Dr. Shelley concluded that Plaintiff's medical records from July 6, 2004 through November 29, 2011 do not indicate that she received any spinal injections in 2011. *Id.* at 3, 6. He also opined that, contrary to Dr. Slaughter's contention in his Affidavit in paragraphs 6 and 7, the records of prior care do not indicate that she had any neck pain or chronic neck pain prior to the motor vehicle crash. *Id.* at 3, 6. Dr. Shelley notes, however, that she "reported back pain as far back as 2004" and mentioned back pain only once in her medical records from 2011, on November 29, 2011. *See id.* at 3-4. Dr. Shelley agrees that Ms. Williamson had intermittent back pain for years, but notes that because Dr. Slaughter had Dr. Cheng's report of a history of sciatica, he had the information about back pain at the time of the evaluation. *Id.* at 4. Dr. Shelley also stated that there were no medical reports of back pain between November 11, 2011 and the date of her accident, April 27, 2012. *Id.* Finally, Dr. Shelley stated that Dr. Slaughter in his IME Report documented a physical exam that was negative for sciatica, indicating that he did not find any objective signs of sciatica on that date. *Id.* at 6.

In his report, Dr. Shelley opined that there was no evidence that Ms. Williamson had continuous severe back pain and/or sciatica right before her motor vehicle accident; the records indicate her baseline pattern was intermittent with the pain generally responsive to treatment or was self-limiting. *Id.* at 5. That pattern, Dr. Shelley stated, contrasts with the more severe and continuous back pain and right lower extremity symptoms after the motor vehicle accident for which more intensive treatment and pain management techniques were recommended. *Id.*

During his deposition, Dr. Shelley testified that Plaintiff hired him primarily to rebut Dr. Slaughter's affidavit. Dep. of Dr. Shelley 22:7-10, ECF No. 102-1. He stated he requested copies

of all medical records relating to Ms. Williamson, and counsel for Plaintiff provided him a portion of her medical records – the records Dr. Slaughter had reviewed to reach his opinions in his affidavit. *See id.* 18:20-19:2, 19:14-18, 20:18-23, 46:13-16; and 123:21-24, ECF No. 106-4. Dr. Shelley had not reviewed prior to his deposition the records from Talento Acupuncture Clinic, which he agreed indicated that Plaintiff was complaining of neck pain to her acupuncturist on October 18, 2011. *Id.* 46:12-47:7, ECF No. 102-1. Dr. Shelley acknowledged he did not review any of the records from Soothing Hands Massage. *See id.* 48:4-49:2. He noted that defense counsel had shown him other records that showed more incidents of neck pain. *Id.* 58:14-20.

Defense counsel asked Dr. Shelley, after reviewing Plaintiff's answer to Interrogatory No. 15 and in light of the medical records he reviewed, "that is a false answer; is that correct?" *Id.* 59:8-60:4. Dr. Shelley answered, "Correct. On 4/27/06, she had epidural steroid injection to the lumbar spine." *Id.* 60:5-6. He noted it was either a lie or a bad memory. *Id.* 60:7-12. Dr. Shelley additionally testified that his statement that Plaintiff had back pain as far back as 2004 was based on the medical record from July 6, 2004 from Dr. Rogers of "SCIATICA. Old problem." Dep. of Dr. Shelley 60:23-61:10, ECF No. 102-1. Dr. Shelley acknowledged, however, that sciatica is a general term referring to some sort of pain or symptom in the leg, thought to be coming out of the low back, but that sometimes you can have mostly leg symptoms and very little in the way of back symptoms. *Id.* 96:2-13, ECF No. 106-1. He also testified that a patient can have lower back pain without having sciatic pain and that lower back pain is different from sciatica. *Id.* 96:14-20. Dr. Shelley later clarified that sciatica and lower back problems are related if it is truly sciatica because people can have sciatica from nerve root problems that come out of the spine. *See id.* 110:5-111:8, ECF No. 109-1. Patients with sciatica do not always have

low back pain, but generally patients with sciatica do have low back pain as well as leg symptoms. *See id.*

**L.       Relevant Motions Practice**

On November 19, 2015, Plaintiff filed a First Motion for Partial Summary Judgment that seeks judgment in her favor on Count II Breach of Fiduciary Duty. Plaintiff argues that Metropolitan owed her a fiduciary duty to act with the highest degree of honesty and loyalty and to act primarily for her benefit when handling her UIM claim, and that Metropolitan breached its duty by rejecting the medical determinations of Dr. Slaughter in his IME Report and offering her only a nuisance value sum of $1,000. Pl.'s First Mot. 2-3, ECF No. 9. Plaintiff argues that, by requiring her to undergo the IME and accepting the medical determinations when deciding to pay her the $10,000 in MedPay, Metropolitan was obligated by its fiduciary duty to follow the determinations of Dr. Slaughter when he found that the accident permanently exacerbated her injuries and that she required future medical treatments. *See id.* 15-16. Plaintiff additionally asserts that Metropolitan breached its fiduciary duty to act with the highest degree of honesty by misrepresenting that its $1,000 offer was sufficient to indemnify her and failing to place her in the same or similar position she would have been in had she been dealing with a person with adequate liability insurance. *Id.* at 17-18.

Defendant does not dispute that it owes a fiduciary duty to its insured, although it asserts the duty is one to deal with its insured in good faith. Def.'s Resp. 9-10, ECF No. 18. Defendant disputes that it has the burden of proof to show by clear and convincing evidence that it fulfilled its fiduciary duty, contending that the cases upon which Plaintiff relies are not pertinent to insurance law. *See id.* at 10-12. Defendant argues that summary judgment should be denied because a dispute exists regarding the value of Plaintiff's claim, the IME Report is not an

admission and is not binding on Defendant, and the evidence in its favor shows that it made an offer consistent with the IME Report and information it had at the time indicating Plaintiff was not continuing with treatment after December 2014. *See id.* at 12-17.

After briefing was completed on the First Motion for Summary Judgment, Defendant filed a Notice of Supplemental Authority in Support of its response, citing *Grasshopper Natural Medicine, LLC v. Hartford Cas. Ins. Co.*, No. CIV 15-0338 JB/CEG, 2016 WL 4009834 (July 7, 2016). Notice, ECF No. 128. Defendant asserted in the Notice that the *Grasshopper* decision makes clear that New Mexico courts do not recognize a separate cause of action for breach of fiduciary duty separate from the fiduciary duty to act in good faith with respect to an insured. *Id.* at 2. In the Notice, Defendant requested, not only that the Court deny Plaintiff's first motion for summary judgment, but that the Court dismiss Count II. *Id.*

Plaintiff responded to the Notice, offering five reasons why the Court should find a fiduciary duty exists and decline to follow *Grasshopper*. *See* Pl.'s Resp. to Notice, ECF No. 130. The same day, Plaintiff filed a motion to certify the following three issues raised in her First Motion for Partial Summary Judgment:

> (1) Does an insurance company owe a fiduciary duty to its insured when handling its insured's claim for uninsured/underinsured motorist coverage?
> (2) When an insured presents a prima facie case that its insurance company violated this fiduciary duty, does the burden of proof rest on the insurance company to demonstrate that it fulfilled its fiduciary duty?
> (3) And does the insurance company have to demonstrate that it fulfilled its fiduciary duty by clear and convincing evidence?

Pl.'s Mot. to Certify 4, ECF No. 131. The next day, Plaintiff filed a separate motion asking the Court to allow her to file the motion to certify, should the Court find that it was untimely filed after the expiration of the deadline for filing pre-trial motions. *See* Pl.'s Mot. to Allow Filing 1, ECF No. 133.

Defendant argues that certification is not proper because the issues in the case are not novel and can be made based on clear guidance from New Mexico precedent and that certification would delay the case and increase the expense of litigation. Def.'s Resp. to Mot. to Certify 4-9, ECF No. 135. Defendant further asserts that the motion to certify should be denied on procedural grounds, because Plaintiff filed her motion to certify 220 days after the pretrial motion deadline and is untimely. Def.'s Resp. to Pl.'s Mot. to Allow Filing 2, ECF No. 136.

## II.     ANALYSIS

### A.  Timeliness and Certification

Under District of New Mexico Local Rule 16.1, modification of deadlines in scheduling orders requires a showing of good cause and the Court's approval. D.N.M. LR-Civ. 16.1. Plaintiff filed her motion to certify far outside the scheduled deadline for filing pretrial motions in this case and before seeking the Court's approval. Plaintiff argues that she could not have filed the motion earlier because there was never any dispute over the fiduciary duty issue. Defendant's position has been consistent throughout the litigation that its fiduciary duty to its insured was limited to dealing with the insured "in good faith in matters pertaining to the performance of the insurance contract," and Defendant has disputed from the outset Plaintiff's argument that Defendant has a burden to show by clear and convincing evidence that it fulfilled its fiduciary duty. Def.'s Resp. to Pl.'s First Mot. 10, ECF No. 18 (filed Dec. 15, 2015). Defendant indicated in its response repeatedly that it viewed the breach of fiduciary duty claim as one stemming from the duty to act in good faith. *See id.* at 9-12, 16.

Nevertheless, Defendant in its initial response asked the Court to deny summary judgment to Plaintiff on Count II; nowhere did Defendant ask for dismissal of Count II for failure to state a claim. Not until it filed its Notice of Supplemental Authority did Defendant

explicitly state, "New Mexico does not recognize a separate cause of action for breach of fiduciary duty by an insurer." Notice 2, ECF No. 128. In the Notice, Defendant asked for the first time for the Court to dismiss Count II, arguing that New Mexico does not recognize it as a separate cause of action from the breach of the covenant of good faith and fair dealing, which Plaintiff asserts in Count III. Defendant thus requested new relief in its Notice, a request for dismissal far outside the deadline set for dispositive motions. The Court therefore finds that Metropolitan's filing of its Notice requesting dismissal of Count II constitutes good cause for Ms. Williamson to have filed her motion to certify out of time. The Court will therefore grant Plaintiff's Motion to Allow Filing of Plaintiff's Motion to Certify and will consider the merits of the motion.[8]

"The Supreme Court may answer by formal written opinion questions of law certified to it by a court of the United States ... if the answer may be determinative of an issue in pending litigation in the certifying court and the question is one for which answer is not provided by a controlling: (1) appellate opinion of the New Mexico Supreme Court or the New Mexico Court of Appeals…." N.M.R.A. 12-607(A). When deciding the appropriateness of certification, district courts should consider whether the issue is one of distinctly state law that should be decided by the state supreme court in the interests of enhancing cooperative judicial federalism. *Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 781 F.3d 1233, 1239 (10th Cir. 2015). Courts, however, should apply judgment and restraint before certifying a question and decide the issues themselves when they can ascertain "a reasonably clear and principled course" from existing case law. *Pino v. United States*, 507 F.3d 1233, 1236 (10th Cir. 2007). Certification is

---

[8] Consequently, the Court will not grant Defendant's request to impose sanctions in the form of attorney's fees against Plaintiff for the belated filing.

appropriate where the question is determinative of the case and sufficiently novel that further guidance is needed. *Id.*

Certification in this case is not appropriate because the case does not present novel issues of law that cannot be easily decided by existing opinions of the New Mexico Supreme Court or New Mexico Court of Appeals. As explained herein, this Court can ascertain "a reasonably clear and principled course" from existing case law on the fiduciary duty issues without resorting to certification. The Court will therefore deny Plaintiff's motion for certification.

### B. Motions for Summary Judgment

On a motion for summary judgment, the moving party initially bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (internal quotations omitted). Under Rule 56(c), only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See id.* at 248.

### 1. Plaintiff's First Motion for Partial Summary Judgment (Count II— Breach of Fiduciary Duty) (ECF No. 9)[9]

The question of whether a particular defendant owes a duty to a particular plaintiff is a question of law. *Moody v. Stribling*, 1999-NMCA-094, ¶ 17, 127 N.M. 630 (quoting *Calkins v. Cox Estates*, 110 N.M. 59, 62, 792 P.2d 36, 39 (1990)). Generally, where a fiduciary relationship exists, the fiduciary relationship imposes a duty on the fiduciary that is greater than the duty of good faith and fair dealing implied in all contractual relationships. *Mayeux v. Winder*, 2006-NMCA-028, ¶ 29, 131 P.3d 85. A fiduciary is obligated to act primarily for the other's benefit in matters connected with the undertaking, and a breach occurs when the fiduciary places its own interests above those of the beneficiary. *Moody*, 1999-NMCA-094, ¶ 27 (quoting *Kueffer v. Kueffer*, 110 N.M. 10, 13, 791 P.2d 461, 464 (1990)).

Plaintiff asserts that Defendant had a fiduciary duty to her to act with the highest degree of honesty and loyalty and to act primarily for her benefit. The cases upon which Plaintiff relies to support this assertion are in the context of the duty of shareholders to one another, *see Jones v. Auge*, 2015-NMCA-016, ¶¶ 38-45, 344 P.3d 989; the duty of a managing member of a limited liability company to other members of the company, *see Mayeux*, 2006-NMCA-028, ¶¶ 1, 27-33; and in-laws taking control of their daughter-in-law's personal finances and her company finances, *see Moody*, 1999-NMCA-094, ¶¶ 22-26. These cases do not address the duty of an insurer to its insured and are inapplicable. Nor does this case involve a transaction that creates a facial presumption of self-dealing, as in *Mayeux*, necessary to shift the burden of proof onto Defendant to show by clear and convincing evidence that it fulfilled its fiduciary duty.

---

[9] In Plaintiff's Reply in support of her motion, she raised a separate argument that she was entitled to summary judgment for breach of fiduciary duty based on the theory that Defendant violated its duty by initially refusing to allow her to keep the MedPay benefits it had paid even though it knew she had not been fully compensated for her injuries. *See* Pl.'s Reply 8-10, ECF No. 30. This argument was the basis for Plaintiff's Third Motion for Summary Judgment, which the Court denied in its Memorandum Opinion and Order filed on March 30, 2017. Mem. Op. and Order 22-23, 26, ECF No. 141. The Court will not re-visit those arguments herein.

Instead, the cases of *Chavez v. Chenoweth*, 1976-NMCA-076, 553 P.2d 703, *Allsup's Convenience Stores, Inc. v. North River Ins. Co.,* 1999-NMSC-006, 976 P.2d 1, and *Azar v. Prudential Ins. Co. of America*, 2003-NMCA-062, 68 P.3d 909, lay the framework of an insurer's duties to its insured. New Mexico courts have recognized a fiduciary duty in the insurance context because of the fiduciary obligations inhering in insurance relationships and the bargaining position occupied by the insured and insurer. *See Allsup's*, 1999-NMSC-006, ¶ 37; *Azar*, 2003-NMCA-062, ¶ 55. An insurance relationship alone, however, does not create a fiduciary duty; something more is needed. *Azar*, 2003-NMCA-062, ¶ 54; *Chavez*, 1976-NMCA-076, ¶ 42.

In *Chavez v. Chenoweth*, the New Mexico Court of Appeals described three examples of when a "fiduciary relationship" arose in the insurance context: (1) when an insurer obtains power to determine whether to accept or reject an offer of compromise of a claim, (2) when an insurer acts on behalf of its insured in the conduct of litigation and the settlement of claims, and (3) when an insurer advises its insured that counsel is not necessary, it assumes a duty not to deceive its insured. *Id.* ¶ 43. The *Chavez* court stated that the fiduciary duty that arose in those situations was "the duty of the insurer to deal in good faith with its insured." *Id.* ¶ 44. In examining the plaintiff's breach of fiduciary duty claim against her insurer, the court explained that it had already determined she sufficiently alleged a bad faith claim against her insurer for the unreasonable delay in paying medical expenses under the insurance contract, *see id.* ¶¶ 30-32, 45, and that her "claim of a fiduciary relationship fails to state any additional claim upon which relief could be granted," *id.* ¶ 46.

The New Mexico Supreme Court subsequently interpreted *Chavez* as holding that the relationship between an insurer and its insured imposes a fiduciary duty on the insurer to deal

with its insured in good faith in matters pertaining to the performance of the insurance contract. *Allsup's*, 1999-NMSC-006, ¶ 37 (explaining New Mexico Supreme Court's interpretation of *Chavez* case in *Romero v. Mervyn's*, 109 N.M. 249, 255 n.3, 784 P.2d 992, 998 (1989)). The *Allsup's* court stated: "A fiduciary relationship exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of one reposing the confidence." *Id.* The *Allsup's* case involved a series of insurance agreements for retrospective premium insurance in which premiums were based on actual losses. *Id.* ¶ 3. The insured paid an estimated premium during the period, and the insurance company retrospectively adjusted the premium downward or upward depending on the insured's paid or incurred losses. *Id.* The insured argued, among other things, that its insurer breached its duties to ensure quality claims handling by a third-party administrator regarding the administration of the workers' compensation claims made against the insured. *See id.* ¶ 4. The New Mexico Supreme Court held that the insurer had a fiduciary duty to its insured that it breached because "the insurer could largely determine the amount of premiums, whereby a certain trust was reposed in the insurer, a trust which the evidence showed was violated." *Id.* ¶ 37.

Subsequently, the New Mexico Court of Appeals in *Azar*, in distilling the legal reasoning of *Allsup's*, *Romero*, and *Chavez*, explained that "an insurer assumes a fiduciary obligation toward an insured only in matters pertaining to the *performance* of obligations in the insurance contract." *Azar*, 2003-NMCA-062, ¶ 54 (italics in original). It noted the fiduciary duty is based on the insurer's "exclusive control and obligations in matters pertaining to the performance of the insurance contract." *Id.* In examining the facts before it, the New Mexico Court of Appeals concluded that, despite the existence of an insurance contract between the parties, the insurer did

not have a fiduciary duty to disclose additional financial information to its insureds concerning the modal premium charges, because there was no evidence that the insurer had exclusive control or a special obligation in the performance of the contract. *See id.* ¶¶ 54-55. The Court of Appeals distinguished *Allsup's* "where the insurer, by undertaking to set the premium amount retrospectively, owed a duty to act in the best interest of the insured with respect to the handling of claims that would ultimately affect the amount of the premium charged." *Id.* ¶ 55.

Turning to the undisputed facts in this case, the evidence does not show that Plaintiff reposed a trust and special confidence in Defendant that imposed a duty to act primarily for her benefit. Unlike the examples set forth in *Chavez v. Chenoweth* and the situation in *Allsup's*, Defendant did not take actions on Plaintiff's behalf, advise her against hiring counsel, or undertake performance obligations in which it had exclusive control. *Cf. Swinney v. State Farm Fire and Cas. Co.,* Civ. No. 10-2021-CM, 2010 WL 5391217, *1 (D. Kan. Dec. 21, 2010) (unpublished) (noting that New Mexico cases finding a fiduciary duty by the insurer involve situations in which the insurer takes actions on behalf of the insured and concluding there was no fiduciary duty where plaintiff alleged her insurer failed to fully and thoroughly investigate cause of damage to her house). Instead, as in *Azar*, Plaintiff did not place a trust and special confidence in Defendant that created a fiduciary relationship greater than its duty to deal with her in good faith.

Although Defendant did not timely request dismissal of Count II, the fiduciary duty issue has been addressed by both parties in the briefs supporting and opposing Plaintiff's first motion for summary judgment, Plaintiff's request for certification, and Plaintiff's motion to allow filing of the motion to certify. Plaintiff thus has fully had an opportunity to respond to the new relief requested by Defendant. Plaintiff's bad faith claim in Count III is based on the same factual

allegations she asserts in Count II. Any jury instructions as to a breach of fiduciary duty claim in Count II would mirror the instructions for the breach of the implied covenant of good faith and fair dealing in Count III because the duties under the facts of this case are defined the same. Because the fiduciary duty claim in Count II imposes no greater duty than the duty set forth in Count III, to allow Count II to remain in the case causes needless confusion. Accordingly, the Court will dismiss Count II and deny Plaintiff's first motion for summary judgment.

**2.** **Plaintiff's Second Motion for Partial Summary Judgment (Count V—Violation of Unfair Practices Act) (ECF No. 12)**

Plaintiff moves for summary judgment on Count V based on the theory that Defendant violated the UPA's requirement to deliver the quality or quantity of services contracted for when it knowingly made an offer insufficient to indemnify her. The New Mexico Unfair Practices Act defines an "unfair or deceptive trade practice" as

> a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale … of goods or services … by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person and includes: …
>
> (17) failing to deliver the quality or quantity of goods or services contracted for ….

N.M. Stat. Ann. § 57-12-2(D). To succeed on a UPA claim under this section, Plaintiff must prove four elements: (1) Defendant made a false statement; (2) Defendant made the statement in connection with the sale of services and knew the statement was false; (3) the defendant made the statement in the regular course of trade or commerce; and (4) the statement was one which may, tends to, or does deceive or mislead any person. *Dellaira v. Farmers Insurance Exchange*, 2004-NMCA-132, ¶ 20, 102 P.3d 111.

Plaintiff argues the $1,000 settlement offer was deceptive and misleading because it falsely indicated to her that her claim was worth only nuisance value. Plaintiff argues that

*Dellaira* stands for the proposition that when an insurance company knowingly makes an offer insufficient to compensate its insured for losses to which the insured is entitled, the insurer has falsely represented that the offer is sufficient to indemnify the insured and may constitute a failure to deliver the quality or quantity of goods or services contracted for in violation of § 57-12-2(D)(17). Plaintiff argues that the undisputed facts show that Defendant knew its $1,000 offer would not compensate her for her losses because the $43,000 third-party settlement barely covered past medical expenses and she had past pain and suffering, future pain and suffering, and future medical payments for spinal injections whose cost was in excess of the policy limits. Plaintiff argues Metropolitan knew of the falsity of its representation because Dr. Slaughter's IME Report informed Metropolitan that she would require future medical treatments.

Defendant argues that its $1,000 settlement offer was a fair and reasonable offer in light of the following facts it considered: the vehicle accident was low impact; Plaintiff received $43,000 from settlement of her third-party claim; Metropolitan gave Plaintiff $10,000 in MedPay for past medical treatments; the only future medical treatment Dr. Slaughter recommended in his IME Report was injections for pain relief that may be beneficial as needed for pain; and it understood based on its records that her December 2014 spinal injection was her last treatment, as there was no record of additional treatments between December 26, 2014 and the July 14, 2015 demand letter.

The Court agrees with Defendant that questions of fact exist for a jury to resolve. It is undisputed that Dr. Slaughter suggested that Plaintiff have the appropriate cervical injection approximately two to three times per year "as needed for pain relief" and injections in the lumbar spine approximately two to three times per year "based on symptom reduction." Viewing the facts and inferences in Defendant's favor, a reasonable jury could conclude that Dr. Slaughter

did not believe future treatments were required for the rest of Plaintiff's life; rather, Dr. Slaughter indicated that the treatments may help reduce Plaintiff's pain, and thus, the continuation of treatments depended on the success of the treatments. A jury could view the evidence of the gap between December 26, 2014 and July 15, 2015 with no records of additional treatment as reasonably leading Metropolitan to believe that Plaintiff did not need further injections and that its $1,000 settlement offer fully indemnified her and was not a false statement. For these reasons, Plaintiff has not shown that no material factual issues exist and she is entitled to judgment as a matter of law.[10] The Court will therefore deny Plaintiff's Second Motion for Partial Summary Judgment.

### 3. Defendant's Motion for Summary Judgment on the Grounds of Plaintiff's Breach of Insurance Policy by Fraud (ECF No. 102)

Defendant argues that it is entitled to summary judgment on all claims because the undisputed facts reveal that Plaintiff deliberately obfuscated and misrepresented the nature of her preexisting medical condition during the claims process. Defendant asserts that Plaintiff materially breached the Policy's anti-fraud provision, rendering the Policy void and extinguishing any duties Defendant may have owed to Plaintiff under the Policy.

A contract may be voided in cases where a party makes a non-fraudulent, but material, misrepresentation or concealment, or where a party makes a fraudulent misrepresentation. *See Sisneros v. Citadel Broadcasting Co.*, 2006-NMCA-102, ¶ 20, 142 P.3d 34; *McElhannon v. Ford*, 2003-NMCA-091, ¶ 15, 73 P.3d 827 (citing with approval Restatement (Second) of

---

[10] Plaintiff also argues in her reply in support of her second motion for partial summary judgment that she is entitled to judgment as a matter of law because Defendant's settlement offer required her to repay the $10,000 in MedPay, so it knew its $1,000 offer was insufficient to indemnify her under its own calculations of the value of her claim. *See* Pl.'s Reply 10, ECF No. 34. In its Memorandum Opinion and Order filed on March 20, 2017, the Court determined that factual questions existed as to whether Defendant made the subrogation demand from Plaintiff, precluding summary judgment on the issue. Mem. Op. and Order 23-24, ECF No. 141.

Contracts, § 161, cmt. b, and § 164(1), cmt. b (1981)); Restatement §§ 160-164. In the insurance context, an insured equally has an obligation to deal fairly and honestly with the insurer. *Modisette v. Foundation Reserve Ins. Co.*, 1967-NMSC-094 ¶ 16, 427 P.2d 21. An insurer may raise as an affirmative defense that the insured violated her duty to act honestly and fairly, which if established, vitiates the insurance policy and bars completely the recovery of compensatory and punitive damages for a bad faith claim. *See Jessen v. National Excess Ins. Co.*, 1989-NMSC-040, ¶ 22, 776 P.2d 1244, *overruled on other grounds by Paiz v. State Farm Fire and Cas. Co.*, 1994-NMSC-079, 880 P.2d 300; N.M. U.J.I. 13-1710.

The insurer has the burden of proving that the insured's misrepresentation or fraud is sufficient to avoid its liability on the contract. *See Crow v. Capitol Bankers Life Ins. Co.*, 1995-NMSC-018, ¶ 38, 891 P.2d 1206; N.M. U.J.I. 13-1710 (stating that plaintiff may not recover under bad faith claim if, with intent to deceive, she dealt with defendant dishonestly about a material fact). "A misrepresentation is an assertion that is not in accord with the facts." *Sisneros*, 2006-NMCA-102, ¶ 20 (quoting Restatement ch. 7 at 424). Concealment is an action intended or known to be likely to prevent the other party from learning a fact and amounts to an assertion that the fact does not exist. Restatement § 160. In cases of misrepresentation or concealment, the insurer may avoid the policy only if it can show that it has been substantially prejudiced by the breaches of the policy. *Eldin v. Farmers Alliance Mut. Ins. Co.*, 1994-NMCA-172, ¶¶ 13-17, 890 P.2d 823. The question of substantial prejudice is generally a question for the jury. *Id.* ¶ 20. The misrepresentation or concealment must be material. *See id.* ¶ 15; N.M. U.J.I. 13-1710. A material fact is one that takes away the party's opportunity to estimate its risk under the contract, that a reasonably prudent insurer would regard as important in evaluating the claim, or would be likely to induce the insurer to manifest assent. *See Crow*, 1995-NMSC-018, ¶ 37; *Hendren v. Allstate*

*Ins. Co.*, 1983-NMCA-129, ¶ 16, 672 P.2d 1137; Restatement § 162(2); N.M. U.J.I. 13-1710. The purpose of the substantial prejudice requirement is to ensure an insureds' reasonable expectation of coverage will not be denied arbitrarily or for fanciful or insufficient grounds. *See Eldin*, 1994-NMCA-172, ¶¶ 15-17.

In contrast, in the case of fraud by an insured, the insurer need not show that the fraud substantially prejudiced the insurer. *Id.* ¶¶ 10-12. "Fraud, by necessity, involves deception by Insureds to obtain proceeds to which they knew they were not entitled." *Id.* ¶ 14. In fraud cases, the insurer therefore must show that the insured intended to defraud the insurer. *Id.* ¶ 12. Intent to defraud is a question for the jury where its determination depends on the credibility of witnesses. *Id.* Intent may be inferred from the circumstances surrounding the dealings between the parties. *Maxey v. Quintana*, 1972-NMCA-069, ¶ 19, 499 P.2d 356.

Defendant argues that Plaintiff voided the Policy by concealing and misrepresenting the true nature of her medical history prior to the April 2012 accident and repeatedly denying having spinal pain or related treatment, which resulted in Dr. Slaughter making erroneous conclusions in the IME Report that Plaintiff used to try to recover benefits under the Policy. *See* Def.'s Mot. 3-4, ECF No. 102. Specifically, Defendant argues that Plaintiff's false statements were (i) her statement to Ms. Bell from ANPAC that she had no previous injuries to her shoulder and neck and failing to reveal her prior neck, shoulder, and back issues; (ii) her statements to Ms. Sadousky, Defendant's claims investigator, that Dr. Roche never treated her for back and neck problems and that Dr. Roche's referral to Dr. Cheng in 2013 was not related to any type of chronic disc problem; (iii) her  failure to inform Metropolitan of Dr. Roche's diagnosis of neck pain with osteoarthritis and of Drs. Rogers' and Fullerton's diagnoses of spinal arthritis, degenerative disc disease, or having an abnormal number of lumbar vertebrae; and (iv) her

statement to Metropolitan that she had never seen a chiropractor before the April 2012 accident. *Id.* at 18-19. Defendant also argues that Plaintiff concealed or misrepresented to Dr. Slaughter her prior history of neck and back symptoms, noting that Plaintiff testified she probably told Dr. Slaughter she had no prior symptoms. *Id.* at 19-20. In addition, Defendant asserts that Plaintiff made false statements in response to Metropolitan's Interrogatory No. 15 during the course of this litigation, admitted to lying to Dr. Cheng in April of 2013, attempted to conceal her history of injury to her mid back by asking Dr. Hermes to change her medical record, and subverted the truth by withholding medical records from Dr. Shelley. *See id.* at 20-21, 24-25.

At this stage in the proceedings, the Court cannot make credibility determinations and must examine the facts and inferences in the light most favorable to Plaintiff, the non-moving party. Defendant disagrees, urging the Court to find that Plaintiff has engaged in a pattern of dishonest dealings during the claims process and in litigation and that her explanations are unworthy of belief. Defendant, however, relies on cases in which the district courts made credibility determinations in evaluating motions to dismiss as a sanction. *See*, *e.g.*, *Garcia v. Berkshire Life Ins. Co. of America*, 569 F.3d 1174, 1176-78 (10th Cir. 2009) (upholding dismissal of plaintiff's case as sanction for her improper actions in fabricating a number of discovery documents); *Reed v. Furr's Supermarkets, Inc.*, 2000-NMCA-091, ¶ 1, 11 P.3d 603 (affirming district court's dismissal of plaintiff's lawsuit as sanction for discovery violations). This Court has already resolved Defendant's motion for sanctions based in part on Plaintiff's response to Interrogatory No. 15, determining that the harsh sanction of dismissal was not appropriate in this case because the degree of actual prejudice, the amount of interference with the judicial process, the lack of notice, and the efficacy of lesser sanctions did not warrant the extreme sanction. *See* Mem. Op. and Order 24-26, ECF No. 141. As for Defendant's pending

motion for summary judgment, the Court must weigh all the facts and inferences in favor of the non-moving party and refrain from making credibility determinations. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008) ("On summary judgment, a district court may not weigh the credibility of the witnesses); *Quaker State Minit-Lube*, 52 F.3d at 1527.

Turning to the record, Plaintiff testified at her deposition that she did not intend to commit fraud. She indicated she did not believe her statement to Ms. Bell was false because the prior pains she had experienced in her shoulder or neck were not of the same nature, and she considered her prior shoulder or neck symptoms as stress pains or pain caused by medicines she was taking at the time, not "injuries," the term Ms. Bell used. Although Plaintiff did not divulge her history of low back pain to Ms. Bell, Plaintiff disclosed to Ms. Sadousky that she had sciatic pain sometimes in response to Ms. Sadousky's questions if Dr. Roche ever treated her for problems with her back and neck. The Court understands that Plaintiff's statement to Ms. Sadousky regarding her treatment for sciatic pain was, to be charitable, not a model of clarity, but the Court must construe all inferences in Plaintiff's favor and a jury could find that Plaintiff's response notified Metropolitan of her history of sciatic pain. Plaintiff testified that she considered her sciatic pain to be different from the back pains she was having after the accident. The medical records, construed in Plaintiff's favor, suggests that she repeatedly described her low back pain as sciatica to her medical providers. The record also shows that she gave to Dr. Slaughter the report by Dr. Cheng in which he noted her history of sciatic pain. Dr. Shelley testified that Ms. Williamson had intermittent back pain for years, but because Dr. Slaughter had Dr. Cheng's report of a history of sciatica, he had the information about her back pain at the time of the evaluation. Because a jury could view the evidence favorably to Plaintiff, the Court cannot

conclude that her statements to Ms. Bell violated the misrepresentation, concealment, or fraud provisions in the Policy as a matter of law.

Defendant next argues Plaintiff made a patently false statement to Ms. Sadousky when Plaintiff replied, "No," when asked if Dr. Roche "wasn't thinking that you had, uh, a disk problem, or did he?" *See* April 15, 2013 Tr. 25:1032-1034, ECF No. 102-4. At the time she asked the question, Ms. Sadousky had been discussing Plaintiff's post-accident tailbone injury. *See id.* Defendant describes Ms. Sadousky as asking if Dr. Roche referred Plaintiff to Dr. Cheng on January 23, 2013, to address a chronic "disc problem." Def.'s Mot. 9, ECF No. 102. Dr. Roche's report from January 23, 2013, states that his assessment was neck pain with osteoarthritis, her x-rays showed some degenerative changes in her cervical spine, and his diagnosis in the referral sheet was for neck pain. *See* Def.'s Ex. E, ECF No. 102-5. Construing the record in Plaintiff's favor, a reasonable jury could find that Plaintiff did not intend to deceive Defendant when she answered, "no," because there is evidence Dr. Roche's referral was to address her neck pain and that Plaintiff did not believe Dr. Roche referred her for a chronic disc problem.

As for Defendant's assertion that Plaintiff made a misrepresentation to Ms. Sadousky that she had never seen a chiropractor, it is undisputed that Plaintiff had seen a chiropractor once before her accident, so her statement was false. A reasonable jury could nevertheless find based on the entire record with all inferences in Plaintiff's favor that Plaintiff did not intend to commit a fraud and deceive Defendant, but that she was forgot. Alternatively, a reasonable jury might construe all inferences in favor of Plaintiff and find that her statement was not material in light of her disclosure to Defendant that she had a history of sciatic pain and the medical record for her chiropractic visit indicates she was there for hip pain following her knee surgery, not for a back

or neck issue. It is unclear based on that medical record whether, when she marked back, tail bone, and shoulder pains, Plaintiff was reporting current or former symptoms.

With respect to Plaintiff's non-disclosure to Dr. Slaughter and Defendant of Dr. Roche's, Dr. Rogers', and Dr. Fullerton's diagnoses of neck pain and back issues, a non-disclosure is equivalent to an assertion that the fact does not exist when the person (a) knows that the disclosure of the fact is necessary to prevent a previous assertion from being a misrepresentation or from being fraudulent or material, or (b) knows disclosure would correct a mistake of the other party as to a basic assumption on which the other party is making the contract, and if the non-disclosure amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing. *See* Restatement § 161. Once again, Plaintiff made some disclosures about her history of sciatica and states that she did not intend to deceive Defendant because she believed her back and neck issues post-accident were of a different nature than her prior symptoms. Moreover, Dr. Slaughter reviewed the x-rays Plaintiff brought and knew she had a preexisting degenerative condition, which he noted in the IME Report. Attached to Mr. Mescall's settlement offer letter were New Mexico Orthopaedics records from July 1, 2011, which listed treatments for "Lumbago" and treatment by Dr. Patton. On January 30, 2013, Metropolitan received signed medical authorizations from Ms. Williamson. This evidence creates questions of fact as to whether Plaintiff knew the non-disclosure was material, or that disclosure would correct a mistake and whether Defendant suffered substantial prejudice from the non-disclosure.

Defendant also raises the issue of Plaintiff's deceit to Dr. Cheng concerning not being sure if her symptoms were related to the car accident. Plaintiff admits lying to Dr. Cheng so he would provide her medical care, but that does not establish the intent to deceive Metropolitan or that she made a material misrepresentation to Metropolitan. Her lie to Dr. Cheng actually

undercut her claim for coverage and would have given Metropolitan a reason to investigate the causes of her injury. This evidence may be relevant to Plaintiff's credibility, but is not sufficient to show that Plaintiff dealt with Defendant dishonestly about a material fact to void the Policy as a matter of law.

Turning to Plaintiff's request to Dr. Hermes to alter her November 17, 2015 medical note that stated she had "a history of injury to this mid back," Defendant argues it is an example of her efforts to subvert the truth of her medical history of back pain. Dr. Hermes' notes explained that Plaintiff wanted the note to specify that she has no prior injury to her back or neck prior to the 2012 car accident. The Court cannot say as a matter of law that Plaintiff intended to deceive Defendant when she asked Dr. Hermes to clarify her medical record; again, a reasonable jury might find Plaintiff credible and believe that Plaintiff did not have mid back pain prior to the car accident and wanted Dr. Hermes' note to accurately reflect the distinction between her pre-accident and post-accident medical history.

Finally, Defendant argues that Plaintiff concealed the truth when her counsel deliberately withheld records from Talento Acupuncture Clinic and Soothing Hands Massage from Dr. Shelley. Although a party may be bound by errors of her attorney, as explained above, when considering the entire record, Defendant has not shown as a matter of law that it was substantially prejudiced by the purported concealment. *Cf. Eldin*, 1994-NMCA-172, ¶ 17 ("Although we recognize that a client is bound by the errors of his or her attorney, we believe that unless it is shown how Farmers was substantially prejudiced by Insureds' breach, strict enforcement of the concealment provision in this case will frustrate Insureds' reasonable expectation that coverage will not be denied arbitrarily.") (Internal citations omitted).

In concluding that Defendant has not met its burden of showing that no genuine issue of material fact exists, the Court finds persuasive the cases of *Ellingwood v. N.N. Investors Life Insurance Company, Inc.*, 1991-NMSC-006, 805 P.2d 70, and *Eldin v. Farmers Alliance Mutual Insurance Company*. In *Ellingwood*, the trial court had determined that the insured made material misrepresentations in his application for insurance that gave the insurer the right of rescission. *Ellingwood*, 1991-NMSC-006, ¶¶ 1. The New Mexico Supreme Court reversed the trial court's entry of summary judgment in favor of the insurance company, concluding that the jury must resolve whether the insured misrepresented his medical condition of scoliosis in light of the evidence that the insured noted a 1980 spinal fusion in the insurance questionnaire, he provided the name and telephone number of his family physician and the surgeon who performed the surgery, and he signed a release for the insurer to obtain his medical records. *See id.* ¶¶ 1, 19-22. The *Ellingwood* court explained:

> [W]hen an applicant gives sufficient information to alert an insurance company to his particular medical condition or history, the company is bound to make such further inquiry as is reasonable under the circumstances in order to ascertain the facts surrounding the information given. Whether and to what extent the company should be charged with "inquiry notice" may well be issues of fact to be resolved by the jury in deciding if the applicant has misrepresented his condition in applying for insurance. Here, it was for the jury to find whether the information provided to the agent was sufficient to alert the company to Streeter's serious spinal condition. If the company was sufficiently alerted to the serious spinal condition, it either should have availed itself of the opportunity to review the records made available to it by the applicant, or be charged with notice of the information in those records.

*Id.* ¶ 21.

Defendant contends *Ellingwood* is distinguishable because it involved fraud in the inducement and the equitable right to rescission based on misrepresentations made prior to the formation of the contract. Nevertheless, the Court finds the case is relevant to the determination of what quality and quantity of evidence may create a genuine issue of disputed fact concerning

whether an insured made a material misrepresentation, acted dishonestly, or acted with fraudulent intent. What information Plaintiff understood Metropolitan to have had concerning her condition is relevant to whether she was acting dishonestly and was attempting to deceive her insurer.

The case of *Eldin* is even more persuasive and on point. In *Eldin*, the insureds filed a claim under their policy that covered them against theft but subsequently admitted to submitting eight fictitious invoices for a portion of the merchandise they alleged was stolen. *See Eldin*, 1994-NMCA-172, ¶¶ 2-4. The insurer denied the claim based on the fictitious invoices and, after the insureds sued for recovery of their claimed loss, the insurer moved for summary judgment based on the argument that it did not need to pay on the policy because the insureds breached provisions regarding fraud, misrepresentation, and concealment. *Id.* ¶ 4. The insureds admitted the merchandise did not come from the store named in the fictitious invoices but insisted that it was nonetheless stolen. *Id.* The insured submitted an affidavit stating that the merchandise had been stolen, the invoices accurately reflected prices of the merchandise, he did not intend to defraud his insurer, but, because he spoke English poorly, he was under the mistaken impression that he was complying with the insurer's requests for documentation for real losses. *Id.* ¶¶ 4, 12. Despite the admissions from the insured that he created fictitious invoices, the New Mexico Court of Appeals held that a jury should decide whether the insureds intended to defraud the insurer, because whether to believe the insured's testimony or find that he made it up in a tardy attempt to cover up the fraud was a question for the jury to decide. *Id.* ¶ 12.

As in *Ellingwood* and *Eldin*, determining whether Plaintiff acted dishonestly about material facts and intended to deceive Defendant can only be done after making credibility determinations that this Court is not permitted to make on a motion for summary judgment.

Plaintiff testified she did not intend to commit fraud, disclosed some information concerning her history of sciatica to Defendant, and believed her post-accident injuries were of a different nature than her pre-accident back and neck issues. In making a demand on her UIM claim, Ms. Williamson disclosed the names of some of her medical providers who had treated Plaintiff prior to the accident for pain in her back and neck. She also gave Metropolitan a signed medical release authorizing it to obtain her medical records on January 30, 2013. This evidence, construed in Plaintiff's favor, creates a genuine issue of material fact for the jury to resolve. For all the foregoing reasons, the Court will deny Defendant's motion for summary judgment.

**IT IS THEREFORE ORDERED** that

1. Plaintiff's Motion to Allow Filing of "Plaintiff's Motion to Certify Questions to the New Mexico Supreme Court" [Doc. 131] (**ECF No. 133**) is **GRANTED**;

2. Plaintiff's Motion to Certify Questions to the New Mexico Supreme Court (**ECF No. 131**) is **DENIED**;

3. Plaintiff's First Motion for Partial Summary Judgment (Count II—Breach of Fiduciary Duty) (**ECF No. 9**) is **DENIED**;

4. Defendant's request to dismiss Count II is **GRANTED** and **Count II—Breach of Fiduciary Duty is DISMISSED WITH PREJUDICE**;

5. Plaintiff's Second Motion for Partial Summary Judgment (Count V—Violation of Unfair Practices Act) (**ECF No. 12**) is **DENIED**; and

6. Defendant's Motion for Summary Judgment on the Grounds of Plaintiff's Breach of Insurance Policy by Fraud (**ECF No. 102**) is **DENIED**.

_____
**UNITED STATES DISTRICT JUDGE**